479 F.2d 1005
 Fed. Sec. L. Rep. P 93,963, Fed. Sec. L. Rep. P 93,999,
1973-1 Trade Cases 74,476,
1973-1 Trade Cases 74,521
 Morton EISEN, on Behalf of Himself and All Other Purchasers
and Sellers of "Odd-Lots" on the New York Stock
Exchange Similarly Situated, Plaintiff-Appellee,
v.
CARLISLE & JACQUELIN and DeCoppet & Doremus, Each Limited
Partnerships under New York Partnership Law,
Article 8 and New York Stock Exchange,
an Unincorporated Association,
Defendants-Appellees.
 Nos. 341, 381, Dockets 72-1521, 30934.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 12, 1972.
Decided May 1, 1973.
Rehearing and Rehearing En Banc Denied in No. 72-1521 May 24, 1973.
 
 Aaron M. Fine, Philadelphia, Pa. (Harold E. Kohn and Allen D. Black, Philadelphia, Pa., and Mordecai Rosenfeld, New York City, on the brief), for plaintiff-appellee.
 Devereux Milburn, New York City (Louis L. Stanton, Jr., James E. Massey, and Carter, Ledyard & Milburn, New York City, on the brief), for defendant-appellee Carlisle & Jacquelin.
 Francis S. Bensel, New York City (Bud G. Holman and Kelley Drye Warren Clark Carr & Ellis, New York City, on the brief), for defendant-appellee DeCoppet & Doremus.
 William E. Jackson, New York City (Russell E. Brooks and Milbank, Tweed, Hadley & McCloy, New York City, on the brief), for defendant-appellee New York Stock Exchange, Inc.
 Before MEDINA, LUMBARD and HAYS, Circuit Judges.
 MEDINA, Circuit Judge:
 
 
 1
 Sufficient factual background for an understanding of the rulings we are about to make in this extraordinary "class action" is to be found in our first opinion Eisen v. Carlisle & Jacquelin, 2 Cir., 391 F.2d 555 (1968), often referred to as Eisen II. On that appeal we remanded the case to the District Court for reconsideration and for findings on specific issues and we retained jurisdiction.[1] While entertaining grave doubts on the questions of notice and manageability, we thought the original rejection of the case as a class action had been too summary, that improper standards had been applied and inadequate consideration given to the specific requirements of amended Rule 23.
 
 
 2
 After almost five years the case is before us again. While much of the delay is not attributable to further proceedings bearing on issues arising under amended Rule 23, a very considerable amount of the time of Judge Tyler and of the lawyers for the respective parties has, in this interval of five years, been devoted to hearings, the taking of depositions, and the preparation and filing of various District Court opinions, preceded by briefs and extensive oral arguments. Much of this time was devoted to an effort by Eisen's counsel to meet the apparently insurmountable difficulties of notice and manageability by adopting the erroneous and frustrating view that some way must be found to make the case viable as a class action. In the end Judge Tyler was persuaded that the innovations described by Judge Weinstein in his speeches[2] and in his series of opinions in Dolgow v. Anderson, D.C., 43 F.R.D. 21 (1967); 43 F.R. D. 472 (1968); 45 F.R.D. 470 (1968); 53 F.R.D. 661 (1971); 53 F.R.D. 664 (1971), were authorized by amended Rule 23. These innovations were the preliminary mini-hearing on the merits and the "fluid recovery," both of which will be fully described in due course. It is clear to us that, with or without these innovations, the notice provided by amended Rule 23 to be given "to all members (of the class) who can be identified through reasonable effort" cannot be given, as Eisen refuses to pay or put up any bond to cover this expense, and, if defendants prevail on the merits, they will be unable to recover any amounts expended by them for this purpose. We are also of the opinion that, on the basis of the new evidence now before us, the lawsuit is unmanageable as a class action, and that no preliminary mini-hearing on the merits and no "fluid recovery" procedures are authorized by the text or by any reasonable interpretation of amended Rule 23. Accordingly, we reverse and dismiss the case as a class action. We also vacate the findings of fact and conclusions of law that were made after the preliminary mini-hearing on the merits.
 
 
 3
 * The Decision Below-52 F.R.D. 253 1971
 
 
 4
 In 1968, when the case was previously before us, it was estimated by someone that there were 3,750,000 members of the class, consisting of those who had bought or sold odd lots on the New York Stock Exchange in the period from May 1, 1962 through June 20, 1966. It was then doubtful whether any of the members of the class could be "identified through reasonable effort." Eisen's position then was and now is that, except possibly in the eventuality of the ultimate adoption of Judge Tyler's suggested plan which envisages payment by defendants of 90% of the cost of giving notice, he will not defray any of the expense of giving notice to any of the members of the class, nor will he post any bond to reimburse defendants for any of their disbursements, pursuant to any order of the District Court, made for the purpose of giving any notice.
 
 
 5
 It now appears that there are 6,000,000 members of the class and of these 2,250,000 can be easily identified.[3] Members of the class reside in every state of the United States and most foreign countries. They speak and understand a great variety of modern languages. The damages sought to be recovered were estimated at the time we last considered the case at something between a maximum of $60,000,000 and a minimum of $22,000,000.[4] Now the estimate has been raised by Eisen's counsel to 120 millions of dollars.
 
 
 6
 In our prior opinion we stated unequivocally that actual notice must be given to those whose identity could be ascertained with reasonable effort and that "in this type of case" plaintiff must pay the expense of giving notice to these members of the class.[5] We further stated that if this could not be done there might be no other alternative than the dismissal of the case as a class action. For some reason not clear to us Judge Tyler disregarded these holdings and concluded that he had discretion, even with reference to those members of the class who could be easily identified, to provide for such notice as he thought to be reasonable in the light of the facts of this particular case.
 
 
 7
 Thus he directed actual notice only to "the approximately 2000 or more class members who had ten or more transactions during the relevant period" and to "5000 other class members selected at random" from the 2,500,000 class members who could easily be identified.[6] With respect to the rest of the 6,000,000 members of the class, Judge Tyler ordered what, without reciting all the details concerning the schedule of proposed publications, we consider to be a totally inadequate compliance with the notice requirements of amended Rule 23. One of the reasons for this was perhaps because Judge Tyler thought of these first notices, by mail and by publication, as merely the first of a series of notices. Judge Tyler then deferred the question of who should pay for this first round of notices until after a "brief" preliminary hearing on the merits. This is what is called the "mini-hearing." We shall have more to say later about this preliminary mini-hearing on the merits of Eisen's triple damage antitrust claim. Accordingly, the hearing was held "on the issue of the allocation of the costs of notice" and Judge Tyler concluded that the defendants must bear 90% of these expenses.
 
 
 8
 To describe Judge Tyler's general scheme as it slowly developed in the series of his many opinions[7] following the remand would be too tedious. The sum and substance of it was that he at last realized that it was highly improbable that any great number of claims would, for a variety of reasons, ultimately be filed by the 6,000,000 members of the class. No claimant in the 6 years of the progress of the action had shown any interest in Eisen's claim. The average odd-lot differential on each transaction had been $5.18. The average individual class member engaging in five transactions would have paid a total odd-lot differential of $25.90. Assuming a 5% illegal overcharge the recovery is approximately $1.30, and when trebled the average class member would be entitled to damages of $3.90. As the costs of administration might run into the millions of dollars, it was not likely that a rush of claimants would eventuate no matter how extensive the publication. As he had surmised in the beginning, and as Chief Judge Lumbard stated in his dissent (Eisen II, 391 F.2d p. 571), the class action was hopelessly unmanageable. So Judge Tyler tried to pull the case out of this morass by resorting to the "fluid recovery," which had been used as a vehicle for carrying out a voluntary settlement in the Drug Cases, State of West Virginia v. Chas. Pfizer & Co., Inc., et al., 314 F.Supp. 710 (S.D.N. Y.1970).[8]
 
 
 9
 The concept of this "fluid recovery" is very simple. Having decided that there is no conceivable way in which any substantial number of individual claimants can ever be paid, "the class as a whole" is substituted for the 6,000,000 claimants. Thus the first round of notices becomes relatively unimportant. The scheme adopted envisages the first round of notices as sufficient to get the ball rolling. Little is said about Step Two. This involves a trial of the case to a judge and jury on the merits-not a preliminary mini-trial this time, but a real full scale trial of the private triple damage antitrust case. In some way the damages to "the class as a whole" will be assessed and the defendants, it seems to be assumed, will promptly pay this huge sum into court. This sum is supposed to constitute the "gross damages" to "the class as a whole." With the money in hand, the case begins to resemble the Transitron and Drug Cases and from then on we are to have the real notices soliciting the filing of claims, the processing of these claims, the fixing of counsel fees and the payment of the general expenses of administration. As "the class as a whole" will include all those who had purchased or sold in the period from mid-1962 to mid-1966 and all those who, at the time of assessing the full damages, were presently purchasing or selling, and those who might in the future purchase and sell, securities in lots of less than 100 shares, it is quite apparent that some of the original 6,000,000 claimants will receive nothing, because they have never heard of the case or for other reasons have failed to file claims and have them processed, and many other new traders, who had no transactions in the period from mid-1962 to mid-1966, will receive some payments. According to Judge Tyler, at least those members of the original class of 6,000,000 who "have maintained their odd-lot activity, will reap the benefits of any recovery" (52 F.R.D. at p. 265). As far as we are aware there has never been, nor can there ever be, a reliable or even rational estimate of how many traders, whether speculators or investors, can be said to be expected to continue as such after the lapse of 10 years or so. As it is suspected that relatively few claims will be filed and the damages assessed are supposed to cover the losses of "the class as a whole," there will be a huge residue, similar to the amounts paid to various charities "to advance public health projects" in the Drug Cases, and this residue is to be used for the benefit of all odd-lot traders by reducing the odd-lot differential "in an amount determined reasonable by the court until such time as the fund is depleted." 52 F.R.D. at p. 265. We are at a loss to understand how this is to be done, but it is suggested that it "might properly be done under SEC supervision or at least with SEC approval."
 
 
 10
 Despite its early expression of doubt on the subject,[9] and what appears at least to be de facto exercise of supervisory powers over Rules or practices on the subject of the amount and uniformity of the rate of commissions on odd-lot purchases and sales, the SEC finally did exercise such powers[10] and we hold that at all times the SEC possessed such powers under Sections 11(b)[11] and 19(b)[12] of the Securities Exchange Act of 1934. No District Court has authority to decide upon the rate of such commissions to take effect until the exhaustion of any residual fund left over by application of a "fluid recovery" in a private triple damage antitrust case, after the payment of claims in a class action or otherwise. The courts may review rulings of the SEC, but they have no more power than the District Court to fix any such rates in the first place or to give directions to the SEC concerning the fixing of such rates or the time within which such rates are to be effective, as part of a judgment in a private triple damage antitrust case.
 
 II
 
 11
 Disposition of Certain Contentions of the Parties
 
 
 12
 Solely for the purpose of making our holdings clear in this difficult and complicated case we think it proper first to dispose of certain contentions of the parties.
 
 
 13
 * We must reject Eisen's claim that the fluid class recovery theory is not ripe for review. Indeed, there is no way to side-step this issue. We specifically remanded the case for consideration of the problem of manageability. The further proceedings on the remand were necessarily concerned with ascertaining whether there was a judicially sound way effectively to administer this action. Administration, of course, includes proof of damages and the distribution of the same. As we point out later in this opinion, Eisen concedes that the action is not manageable if fluid class recovery is not permissible. We must face this issue if we are to pass on the question of manageability, which is the most important point in the case. We are no longer at the early stages of this case where it might be possible to put off to a later time the troublesome question of what to do with the damage fund if only a small number of claims are filed against the fund. See In Re Antibiotic Antitrust Actions, 333 F. Supp. 278, 281-282 (S.D.N.Y.1971).
 
 B
 
 14
 Moreover, we think the three cases cited by Judge Tyler as "respectable precedent" for fluid class recovery are all distinguishable. These three cases are: Bebchick v. Public Utilities Commission, 115 U.S.App.D.C. 216, 318 F.2d 187, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); the Drug Cases, 314 F.Supp. 710 (S.D.N.Y.), aff'd 440 F.2d 1079 (2d Cir. 1971); and Daar v. Yellow Cab Company, 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732 (1967).
 
 
 15
 Judge Wyatt's extraordinary feat of judicial administration in carrying out the terms of the one hundred million dollar settlement in the Drug Cases deserves all the praise it has received. But it was a consensual affair made possible by the agreement of the parties and without objection to the assumption by the District Court of jurisdiction to accept and administer the fund. Here we have no fund. There is no settlement. Every issue is contested and litigated. And authority to permit this action to proceed as a class action must be found within the four corners of amended Rule 23, as interpreted in the Reviser's Note. Applying this test we hold Eisen's class action must be dismissed. Bebchick was not a class action in any sense of the word. Amended Rule 23 was not involved. In the exercise of its powers of review, the Court of Appeals for the District of Columbia Circuit reversed a judgment of the District Court approving the action of the Public Utilities Commission of the District of Columbia supporting a fare increase by the transit company. In the meantime, the additional cash fares, now found to be illegal, had been collected. There was no way to direct refunds as those who paid these cash fares could not be identified. So, also in the exercise of its powers of review the Court of Appeals directed the amount of these additional cash fares to be set up in the books of the transit company to be used, in the discretion of the regulatory commission "to benefit bus riders as a class in pending or future rate proceedings." We cannot find that this case has any bearing on any of the issues in this amended Rule 23 case. Finally, Daar was a case arising under a state class action statute very different in its phraseology from amended Rule 23. The ruling was made on a demurrer to the complaint so the approach to the legal issues was entirely different from the making of a judicial determination, on the basis of proof, of whether or not the requirements of amended Rule 23 had been met. Moreover, the court was evidently of the view that the individuals who had been damaged by the alleged overcharge in taxi fares would ultimately have to prove their separate and individual damages. 433 P.2d at 740.
 
 
 16
 For the reasons stated in this opinion we disagree with the holding in the Dolgow cases.
 
 C
 
 17
 The Merits of Eisen's Triple Damage Antitrust Claim
 
 
 18
 The defendants by extensive and even cogent arguments have urged us not only to vacate Judge Tyler's findings and conclusions on the merits of the case but to decide that there is no merit in Eisen's antitrust claim. Thus the defendants argue that in the context of an antitrust suit brought against defendants acting within a self-regulatory industry the per se rule of antitrust liability is inapplicable, and that even under a rule of reason the practices of the odd-lot defendants and the Exchange were not violative of the antitrust laws. In essence the defendants contend that Judge Tyler incorrectly applied the Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) doctrine, and should have concluded that the fixing of the odd-lot differential is necessary to the proper implementation of the Securities Act. Also the defendants assert that the Securities and Exchange Commission has primary jurisdiction over the substantive issues presented in this litigation. As already appears in this opinion, we hold and decide that the SEC does possess supervisory powers over the amount and uniformity of the commissions to be paid on odd-lot purchases and sales. But this is only part of the picture. There are many facets to this complicated case. We feel it is proper for us to say only that the record before us constitutes no proper basis for any decision of the merits, tentative or otherwise.
 
 III
 Controlling Principles
 
 19
 When discoursing on the arts or belles-lettres colorful language stimulates the imagination, beguiles one into useful symbolism and opens up the avenues to creative thought. But in the process of rationalizing legal conclusions and arriving at a sound and proper determination of questions of the interpretation of statutes, procedural rules and constitutional limitations, cliches and rhetorical devices generally miss the mark. Something more substantial is necessary to establish a base for the proper decision of difficult and complex questions of law. One reason for this is that the solution is found more often than not by the application of fundamentally simple principles.
 
 
 20
 Thus statements about "disgorging" sums of money for which a defendant may be liable, or the "prophylactic" effect of making the wrongdoer suffer the pains of retribution and generally about providing a remedy for the ills of mankind, do little to solve specific legal problems. The result of this approach is almost always confusion of thought and irrational, emotional and unsound decisions. In cases involving claims of money damages all litigation presumes a desire on the part of the judicial establishment to make the wrongdoer pay for the wrongs he has committed, but to do this by applying settled or clearly stated principles of law, rather than by some process of divination. Punishment of wrongdoers is provided by law for criminal acts in statutes making it a crime punishable by fine or imprisonment to violate the antitrust laws. In certain civil suits punitive damages may be awarded; and in private antitrust cases the possible recovery of triple the loss actually suffered by a plaintiff is very properly praised as a supplementary deterrent. But none of these considerations justifies disregarding, nullifying or watering down any of the procedural safeguards established by the Constitution, or by congressional mandate, or by the Federal Rules of Civil Procedure, including amended Rule 23. It is a historical fact that procedural safeguards for the benefit of all litigants constitute some of the most important and salutary protections against oppressions,[13] including oppressions by those whose intentions may be above reproach.
 
 
 21
 We adhere to what we have written in support of the remand of this case in Eisen II. On the basis of the new evidence adduced on the remand, what we are now doing is interpreting and applying various provisions of an amended and improved procedural device intended to facilitate the judicial disposition of the individual claims of the separate members of a class of persons so numerous that joinder of all members is impracticable. Amended Rule 23 was not intended to affect the substantive rights of the parties to any litigation. Nor could it do so as the Enabling Act that authorizes the Supreme Court to promulgate the Federal Rules of Civil Procedure provides that "such rules shall not abridge, enlarge or modify any substantive right."[14]
 
 
 22
 The applicable substantive law is Section 4 of the Clayton Act[15] that authorized the private triple-damage antitrust suit to recover damages by a person who has been "injured in his business or property" by reason of a violation of the antitrust laws. That the claims of many may not be treated collectively or as "the class as a whole" is what the Supreme Court decided in Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L. Ed.2d 319 (1969), where plaintiff, in a diversity case sued as representative of a class of some 4000 shareholders of an insurance company. Her individual claim was for less than $10,000. She was not permitted to aggregate her claim with the separate claims of the other members of the class which amounted to $1,200,000. Despite the fact that amended Rule 23 was aleady in effect, the case was dismissed. Moreover, in the recent case of Hawaii v. Standard Oil Co. of California, et al., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972),[16] it was again held that only persons actually injured in their business or property could claim damages under the Clayton Act.
 
 
 23
 Eisen also alleges that the Exchange is liable for its failure to regulate the odd-lot differential as required by Section 6 of the Securities Exchange Act. He argues that Section 6, 15 U.S.C., Section 78f, requires the securities exchanges to prescribe rules and regulations for the regulation of the industry. Failure so to regulate allegedly subjects the defendant-Exchange to liability to those who have suffered injury due to the abdication of this regulatory responsibility. The duty to regulate emanates from the Exchange Act, but the right of an injured party to recover damages is, according to Eisen, based upon federal common law, J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Baird v. Franklin, 141 F.2d 238 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944). Thus, if Eisen is correct and Section 6 of the Act creates a statutory duty on the Exchange to protect members of plaintiff's class, then these members "may sue for injuries resulting from its breach and (the) common law will supply a remedy if the statute gives none," Baird v. Franklin, 141 F.2d at 245.
 
 
 24
 The fundamental doctrine that permeates our opinion in Eisen II, and which we are now about to apply again in this same case, is whether the requirements of amended Rule 23 have been met. We find no helpful analogy in the procedures that have been used for generations in connection with preliminary injunctions or other provisional remedies intended to preserve the status quo.
 
 
 25
 So, we shall proceed to examine in some detail the provisions of amended Rule 23 in the light of the long and explicit Advisory Committee's Note, 39 F. R.D. 98, and decide whether or not Judge Tyler has followed our directions to appraise and to apply each of the factors enumerated on the face of the Rule. In the light of our conclusions with respect to notice and manageability, we do not reach the subject of adequate representation.
 
 IV
 
 26
 Lack of Individual Notice to "All Members Who Can be
 
 
 27
 Identified Through Reasonable Effort"
 
 
 28
 Our prior ruling in Eisen II is clear and specific. If identification of any number of members of the class can readily be made, individual notice to these members must be given and Eisen must pay the cost. If this cannot be done, the case must be dismissed as a class action. Amended Rule 23(c)(2) unambiguously states that notice to the class generally shall be the "best notice practicable," and then "including individual notice to all members who can be identified through reasonable effort." Moreover, the Advisory Committee's Note states (39 F.R.D. 106-107): "Indeed, under subdivision (c)(2), notice must be ordered, it is not merely discretionary * * *."[17] While Judge Tyler seems to have realized that this phase of amended Rule 23 has decided constitutional overtones, he apparently thought the flexibility of the Rule and our statement that the Rule was to be given a liberal interpretation authorized him to exercise his discretion even if this involved the complete disregard of our specific and unambiguous ruling on the subject of actual individual notice to identifiable members of the class. This ruling alone compels a reversal of the order appealed from and the dismissal of the case as a class action.
 
 V
 
 29
 The Preliminary Mini-Hearing on the Merits Was Not
 
 
 30
 Authorized by Amended Rule 23 and the District
 
 Court Had No Jurisdiction or Competence
 
 31
 to Hold Such a Hearing
 
 
 32
 The Federal Rules of Civil Procedure set forth a considerable variety of procedural devices designed for the disposition of cases on the merits. There may be traditional trials to a judge or to a judge and jury; there may be summary judgments, dismissals with or without prejudice for failure to state a claim and so on. But neither in amended Rule 23 nor in any other rule do we find provision for any tentative, provisional or other makeshift determination of the issues of any case on the merits for the avowed purpose of deciding a collateral matter such as which party is to be required to pay for mailing, publishing or otherwise giving any notice required by law. In most cases the so-called tentative findings and conclusions arrived at without the salutary safeguards applicable to all full scale trials on the merits will be extremely prejudicial to one or the other of the parties who bear the brunt of such findings and conclusions, and such prejudice may well be irreparable.
 
 
 33
 We agree with the ruling by the Fifth Circuit in Miller v. Mackey International, Inc., 452 F.2d 424 (5th Cir. 1971), that the preliminary hearing on the merits was improper. As stated by Judge Wisdom, 452 F.2d at page 427:
 
 
 34
 In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.
 
 
 35
 This was the first time, as far as we are aware, that any Court of Appeals has passed on the point. As noted by Judge Wisdom in footnote 5 on page 429 of 452 F.2d, this Court did not have occasion to rule on the question when it decided the appeal from Judge Weinstein's summary judgment for defendants in Dolgow, 438 F.2d 825 (2d Cir., 1971). While Judge Weinstein's oral order not only granted summary judgment for defendants but also held the case not to be a proper class action, the posture of the case on the appeal to our Court was such that the Court had no occasion to consider the propriety of the preliminary mini-hearing on the merits that had been conducted by Judge Weinstein. Nor was that question before this Court in Green v. Wolf Corporation, 406 F.2d 291 (1968). See footnote 15 on pages 301-302.
 
 
 36
 Of the few District Court decisions on the point most of these disagree, as, of course, does the Fifth Circuit, with the innovations described in Dolgow,[18] and there is little to commend the reasoning or lack of reasoning in the others.[19] No provision is made in amended Rule 23 for any such mini, preliminary or other hearing on the merits. It does violence to the whole concept of summary judgment, and cannot be reconciled with the requirement in Rule 23 that "as soon as practicable after the commencement of the action" the question of class suit vel non be decided.
 
 
 37
 Moreover, in this case we did not in our disposition of the prior appeal intend to relinquish to the District Court any jurisdiction to pass on the merits of the case but only to decide if the requirements of amended Rule 23 had been met. Accordingly, we are constrained to hold that the whole preliminary minihearing on the merits proceeding, including the findings of fact and conclusions of law, was conducted and made without jurisdiction.
 
 VI
 As a Class Action the Case Is Unmanageable
 
 38
 From the beginning it has been Judge (then Chief Judge) Lumbard's view that as a class action the case is unmanageable and that it should be dismissed as a class action. It turns out that he was right. As soon as the evidence on the remand disclosed the true extent of the membership of the class and the fact that Eisen would not pay for individual notice to the members of the class who could be identified, and the evidence further disclosed that the class membership was of such diversity and was so dispersed that no notice by publication could be devised by the ingenuity of man that could reasonably be expected to notify more than a relatively small proportion of the class, a ruling should have been made forthwith dismissing the case as a class action. This dismissal could have saved several years of hard work by the judge and the lawyers and wholly unnecessary expense running into large figures. The fact that the cost of obtaining proofs of claim by individual members of the class and processing such claims was such as to make it clear that the amounts payable to individual claimants would be so low as to be negligible also should have been enough of itself to warrant dismissal as a class action. Other cases involving millions of diverse and unidentifiable members of an alleged class had been dismissed as unmanageable or altered in composition.[20] And so even Eisen and his counsel conceded that the class was not manageable unless the "fluid recovery" procedures were adopted.
 
 Thus, in the language of Eisen's counsel:
 
 39
 There are some six million persons in the class. If each had to present his own personal claim for damages, the class, indeed, would not be manageable. The facts in Stipulation No. 2 only underscore the obvious. In both Cherner v. Transitron Electronic Corporation, 201 F.Supp. 934 (D. Mass.1962) and Illinois Bell Telephone Co. v. Slattery, 102 F.2d 58 (7th Cir. 1939). (the cases included in Stipulation No. 2), the refund process overwhelmed the refunds. And both cases involved, quite obviously, classes much smaller than the class at bar.
 
 
 40
 Where there are millions of dispersed and unidentifiable members of the class notices by publication giving the essential information required by amended Rule 23 are a farce.[21] And, when it comes to the filing and processing of claims, lawyers specializing in class actions have stated that the only effective way to induce any reasonable number of members of the class to file claims is to conduct full-scale campaigns on TV and radio, solicit appearances by advocates of consumers' rights such as Ralph Nader, letters from Congressmen to their constituents, public statements by various state attorneys general "and coverage in various news media, union newsletters and the like," also to persuade the Federal Communications Commission to classify announcements of this character as "public service announcements."[22]
 
 
 41
 All the difficulties of management are supposed to disappear once the "fluid recovery" procedure is adopted. The claims of the individual members of the class become of little consequence. If the damages to be paid were only the aggregate of the sums found due to individual members of the class, after their claims had been processed, it is fairly obvious that in cases like Eisen the expenses of giving the notices required by amended Rule 23 and the general costs of administration of the action would exceed the amount due to the few members of the class who filed claims and the individual members of the class would get nothing.[23] We referred to this possibility in our opinion in Eisen II, 391 F.2d at pages 567 and 570.
 
 
 42
 But if the "class as a whole" is or can be substituted for the individual members of the class as claimants, then the number of claims filed is of no consequence and the amount found to be due will be enormous, affording, we are told, plenty of money to pay all expenses, including counsel fees, and a residue so large as to justify reduction of the oddlot differential for years in the future, for the benefit of all traders, past, present and future, who are to be considered to be members of "the class as a whole."
 
 
 43
 Even if amended Rule 23 could be read so as to permit any such fantastic procedure, the courts would have to reject it as an unconstitutional violation of the requirement of due process of law. But as it now reads amended Rule 23 contemplates and provides for no such procedure. Nor can amended Rule 23 be construed or interpreted in such fashion as to permit such procedure. We hold the "fluid recovery" concept and practice to be illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper.
 
 VII
 A Few General Observations
 
 44
 Perhaps in part due to the liberal views on the subject of amended Rule 23, as expressed in our opinion in Eisen II, and doubtless stimulated by the counsel fees allowed in the Transitron and the Drug Cases, where large voluntary settlements had been approved and administered by District Judges, there has followed such a quantity of comment pro and con on the questions of law we are to decide in this case, by law professors, by judges, and especially by lawyers specializing in class actions, expressed in numerous articles, opinions and published speeches, that the task of even attempting to enumerate all of these for purposes of documentation is too much for us.
 
 
 45
 Class actions have sprouted and multiplied like the leaves of the green bay tree. No matter how numerous or diverse the so-called class may be or how impossible it may be ever to compensate the individual members of the class, a champion steps forth. Thus class actions have been brought "on behalf of all subscribers of business telephones in New York County, all Master Charge credit card holders similarly situated, all consumers of gasoline in a given state or states, all homeowners in the United States, and even all people in the United States."[24] So far as we are aware not a single one of these class actions including millions of indiscriminate and unidentifiable members has ever been brought to trial and decided on the merits. But the preliminary procedures, including the preliminary mini-hearing on the merits, such as those conducted by Judge Tyler in order to decide whether or not this case was a proper class action, and the huge and unavoidable expense of producing witnesses and documents pursuant to discovery orders, have brought such pressure on defendants as to induce settlements in large amounts as the alternative to complete ruin and disaster, irrespective of the merits of the claim.[25]
 
 
 46
 The "in terrorem" effects of the innovations described in Dolgow have been highly praised by those who invented or applied them.[26] But Professor Milton Handler, whose Annual Antitrust Review has for many years brought his expertise in Trade Regulation and, we are happy to say, some entertainment to the members of the Association of the Bar of the City of New York, and to the members of the Bench and Bar in general, minces no words. He calls these procedures "legalized blackmail."[27] There is reason to believe that the practical effect of these procedures, and the fact that possible recoveries run into astronomical amounts, generate more leverage and pressure on defendants to settle, even for millions of dollars, and in cases where the merits of the class representatives claim is to say the least doubtful, than did the old-fashioned strike suits made famous a generation or two ago by Clarence H. Venner.
 
 
 47
 And yet, even if amended Rule 23 furnishes no satisfactory solution in situations where immense numbers of consumers have been mulcted in various ways by illegal charges, it would seem that some means should be provided by law for the redress of these wrongs to the community and to society as a whole. The numerous decisions by courts in these class action cases have at least exposed the lack of adequate remedy under existing laws. From our extensive study of the whole situation in working on this Eisen case it would seem that amended Rule 23 provides an excellent and workable procedure in cases where the number of members of the class is not too large. It seems doubtful that further amendments to Rule 23 can be expected to be effective where there are millions of members of the class, without some infringement of constitutional requirements. The problem is really one for solution by the Congress. Numerous administrative agencies protect consumers in various ways. It should, we think, be possible for the Congress to create some public body to do justice in the matter of consumers' claims in such fashion as to afford compensation to the injured consumer. If penalties are to be imposed upon wrongdoers, at least let the Congress decide how the money is to be spent.
 
 
 48
 Another possibility, suggested by the Report and Recommendations of the Special Committee of the American College of Trial Lawyers, is a further amendment to amended Rule 23 consisting of a new subdivision providing:
 
 
 49
 In an action commenced pursuant to subdivision (b)(3), the court shall consider whether justice in the action would be more effectively served by maintenance of the action as a class action pursuant to subdivision (b)(2) in lieu of (b)(3).
 
 
 50
 The procedure involved in applying for prospective injunctive relief is relatively simple and inexpensive, social and economic reforms may be implemented and an end put to illegal practices with far more benefit to the community than that derived from minimal or token payments to individual members of a class. Attorney's fees in such cases should also provide adequate incentive to counsel for the representative or representatives of the class.[28]
 
 Conclusion
 
 51
 For the reasons stated in this opinion the findings and conclusions following the mini-hearing are vacated and set aside, the various rulings of the District Court sustaining the prosecution of the case as a class action are reversed and, as a class action, the case is dismissed, without prejudice to the continuance of so much of the claim asserted in the complaint as refers to Eisen's alleged individual rights against the defendants.
 
 
 52
 HAYS, Circuit Judge (concurring in the result):
 
 
 53
 I concur in the result because I am unable to accept the ruling of the district court requiring the defendants to pay 90 per cent of the cost of notice, since, if the defendants should finally prevail, they would not be reimbursed for this expenditure.
 
 
 54
 ON PETITION FOR REHEARING.
 
 
 55
 A petition for a rehearing having been filed herein by counsel for the appellee,
 
 Upon consideration thereof, it is
 
 56
 Ordered that said petition be and it hereby is denied.
 
 
 57
 A petition for a rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for plaintiff-appellee, a poll of the judges in regular active service having been taken at the request of such a judge, and there being no majority in favor thereof,
 
 Upon consideration thereof, it is
 
 58
 Ordered that said petition be and it hereby is denied.
 
 
 59
 Judges Hays, Oakes and Timbers dissent.
 
 
 60
 /s/ HENRY J. FRIENDLY
 
 Chief Judge
 
 61
 KAUFMAN, Circuit Judge, with whom FRIENDLY, Chief Judge, and FEINBERG, MANSFIELD, and MULLIGAN, Circuit Judges, concur.
 
 
 62
 I vote against en banc, not because I believe this case is unimportant, but because the case is of such extraordinary consequence that I am confident the Supreme Court will take this matter under its certiorari jurisdiction. Judge Oakes's opinion, dissenting from the denial of en banc, illustrates some of the far-reaching implications the panel's opinion might have on the initiation and administration of certain class action litigation in the future. En banc consideration by this court, however, would merely serve as an instrument of delay. Moreover, the application for certiorari will not go to the Supreme Court barren of the views of the judges of this court as, for example, in the Pentagon Papers case, where the court convened en banc but, because of urgent time considerations, did not write opinions. Judge Oakes has set forth his views on the merits with vigor and Judge Medina's panel opinion articulates the opposing position. Our decision to decline en banc consideration of this case in no way implies, as my brother Oakes suggests, the demise of en banc in future cases of exceptional importance; nor does it threaten to turn this collegial court into a fragmented judicial body of panels of three, in which each panel's opinions speak only for the panel, and not for the whole Court. Instead, we wisely speed this case on its way to the Supreme Court as an exercise of sound, prudent and resourceful judicial administration.
 
 MANSFIELD, Circuit Judge:
 
 63
 I concur in Judge Kaufman's opinion.
 
 
 64
 The issues raised by this appeal are of exceptional importance and therefore deserving of the most authoritative resolution possible. If the recent history of en banc proceedings in this Court is any indication, however, an en banc hearing would result in opinions expressing diverse views, necessitating ultimate resolution by the Supreme Court. See, e. g., Rodriguez v. McGinnis, 456 F.2d 79 (2d Cir. 1972), reversed sub nom. Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). In the meantime one year's delay would be added to this already protracted proceeding. This predicament might be avoided by granting the petition and, with the case then before us de novo, invoking the Supreme Court's jurisdiction through the rarely used procedure provided by 28 U.S.C. Sec. 1254(3), which empowers us sua sponte to certify grave questions to it for final decision where we believe the answers to be in doubt. See 28 U.S.C. Rules 28-29, Revised Rules of the Supreme Court (1973 Supp.); Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 728-729, 49 S.Ct. 499, 73 L.Ed. 918 (1929). However, since I am persuaded that the Supreme Court, in view of the far-reaching significance of the issues, will in all likelihood grant certiorari, I believe that such a procedure is unnecessary. Otherwise I would agree with Judge Oakes' forceful plea for an en banc hearing.
 
 HAYS, Circuit Judge (dissenting):
 
 65
 I believe that this case should be reconsidered en banc.
 
 
 66
 OAKES, Circuit Judge (dissenting from the denial of rehearing en banc), with whom TIMBERS, Circuit Judge, concurs:
 
 
 67
 For this court not to hear a matter of this significance is to render the en banc statute[1] a nullity. One may in this era of burgeoning appellate business quite plausibly take the view that the en banc procedure should not be used "merely" to correct individual injustices[2] or mistakes, but only in a case where the panel decision[3] is in serious conflict with prior decisions of the particular Circuit Court of Appeals or where it is of extreme importance. Even with that view, however, this case, if no other decided in recent years, qualifies for en banc treatment. I say this for the following reasons which I will enumerate, adding a few comments subsequently:
 
 
 68
 1. The case is extremely important and vitally affects class actions, particularly environmental and consumer actions, affecting large numbers of citizens.
 
 
 69
 2. The panel opinion reaches a result which is very doubtful to say the least; on its face the opinion appears to nullify much of Fed.R.Civ.P. 23.
 
 
 70
 3. The case should be heard en banc; the procedure is there and presumably is to serve some purpose, and the Supreme Court has admonished the Courts of Appeal to make use of it.
 
 
 71
 4. There are no compelling reasons for not hearing the case en banc.
 
 
 72
 The Case Is of Extreme Importance; It Vitally Affects Class
 
 
 73
 Actions.
 
 
 74
 I would expect that the case would be conceded by each and every one of the judges voting to deny en banc treatment, if he were polled, to be of extreme importance. Judge Kaufman's opinion makes this concession.
 
 
 75
 The panel opinion defines as unmanageable any case involving a large class where actual notification of readily ascertainable members is expensive. It calls notice by publication to a large class a "farce" and casts constitutional doubts on any other construction of Rule 23. The case accordingly affects adversely much consumer and environmental litigation, as well as all antitrust and other claims by numbers of little people for small amounts.[4] The panel opinion seems on its face to give a green light to monopolies and conglomerates who deal in quantity items selling at small prices to proceed to violate the antitrust laws, unhampered by any realistic threat of private consumer civil proceedings, leaving it to some vague future act of Congress to protect the innocent consumer. The panel opinion as I read it tells polluters that they are pretty safe from class actions because even if a whole city is blanketed in smoke or its water supply contaminated, the plaintiffs can never advance the money for notices to, say, all the people in the city phone book, who certainly are identifiable. I will not belabor the point of importance.
 
 
 76
 The Panel Opinion Reaches a Very Doubtful Result.
 
 
 77
 To vote in favor of rehearing a case en banc should not necessarily mean that the judge is thereby committed to overturn the panel opinion as Judge Timbers pointed out dissenting from the denial of rehearing en banc in Zahn v. International Paper Co., 469 F.2d 1033 (2d Cir.), rehearing en banc denied, 469 F.2d 1033, 1041, n.1 (2d Cir. 1972) (dissenting opinion of Timbers, J., joined by Oakes, J.), cert. granted, 410 U.S. 925, 93 S.Ct. 1370, 35 L.Ed.2d 585 (1973) (No. 72-888). At the same time, if one agrees fully with the panel decision one does not generally vote to hear it en banc. I take the view that it is only when there is reasonable doubt on a point, or the question or questions are unresolved in the judge's mind, that he should vote for en banc, and then only in unusual or extremely important cases, or cases which conflict with prior decisions of this circuit or the Supreme Court.
 
 
 78
 Serious questions about the panel's conclusions as to the management of class actions exist. Class actions, I had thought, were "an invention of equity . . . mothered by the practical necessity" of providing a practical procedure to enable large numbers of litigants to enforce their common rights. Montgomery Ward & Co. v. Langer, 168 F.2d 182, 187 (8th Cir. 1948). See C. Wright, Federal Courts 306 (2d ed. 1970); Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 375 et seq. (1967). The panel's decision seems utterly inconsistent with the flexible, equitable spirit that motivated the innovative 1966 amendments to Fed.R.Civ.P. 23.
 
 
 79
 The panel opinion is at the very least highly debatable on its face since it requires, without even considering division of a large class into a much smaller subclass under Rule 23(c)(4)(B), an individual plaintiff to pay the cost of actual notice to the identifiable members of the entire class which he seeks to represent and since it declares-I may add without any support or citation of authority whatsoever other than judicial fiat-that "Where there are millions of dispersed and unidentifiable members of the class notices by publication giving the essential information required by amended Rule 23 are a farce." Op. at 1017.
 
 
 80
 The view of Eisen II, 391 F.2d 555 (1968), that Rule 23(c)(2) requires individual notice to all members of Eisen's class who can be identified through "reasonable effort" has been criticized as "unnecessarily restrictive . . . ." 7A C. Wright & A. Miller, Federal Practice and Procedure Sec. 1786 at 148 (1972); see also Kaplan, supra, 81 Harv.L.Rev. at 396; Comment, Class Actions under Federal Rule 23(b)(3)-The Notice Requirement, 29 Md.L.Rev. 139 (1969). Certainly given the importance of the class action as a means for the little man to bring wealthy or powerful interests into court, Eisen's inability to bear the costs of mailing notice to those 2,000,000 or so "easily identifiable individuals" similarly situated, Eisen v. Carlisle & Jacquelin, 52 F.R.D. 253, 257 (S.D.N.Y. 1971), should not necessarily terminate the class action character of this suit. It may be appropriate, as Judge Tyler suggested below, to charge the defendants with a portion of the notification costs. See Dolgow v. Anderson, 43 F.R. D. 472, 498-500 (E.D.N.Y.1968) (Weinstein, J.); C. Wright, supra at 313-14. But even if these two questions were decided against the plaintiff, an en banc decision drawing sustenance from the flexible, still developing Rule 23 jurisprudence might embrace one of several other alternatives to the panel's burial of larger-number plaintiff class actions. These include the alternatives suggested by Judge Weinstein and others discarded in the panel opinion. But there are others, too.
 
 
 81
 The plaintiff class might, for example, be divided into much smaller subclasses, Fed.R.Civ.P. 23(c)(4)(B), of odd lot buyers for particular periods, and one subclass treated as a test case, with the other subclasses held in abeyance. Individual notice at what would probably be a reasonable cost could then be given to all members of the particular small subclass who can be easily identified. See Kaplan, supra, 81 Harv.L.Rev. at 390-91; Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buffalo L.Rev. 433, 438-54 (1960).
 
 
 82
 The problem of individualized notice under Rule 23(c)(2) is so important to the future of class actions and the panel's resolution of it seems so inconsistent with the spirit of Rule 23, in short, that consideration by the full court seems essential.
 
 
 83
 At least as questionable is the panel's conclusion that this class action is unmanageable and should be dismissed because "no notice by publication could be devised by the ingenuity of man that could reasonably be expected to notify more than a relatively small proportion of the class." Op. at 1017. The panel seems to intimate in a footnote that individualized notice to all 6,000,000 members of the class borders on being a constitutional requirement. Op. at 1017, n. 21. This intimation seems to me to be profoundly incorrect. In my view notice to class members who cannot be identified is not a constitutional requirement and not a prerequisite to a manageable class action. All that the due process clause requires is a procedure that "fairly insures the protection of the interests of absent parties who are to be bound by [the judgment]." Hansberry v. Lee, 311 U.S. 32, 42, 61 S.Ct. 115, 118, 85 L. Ed. 22 (1940) (not cited by panel decision). See Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 313-314, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Northern Natural Gas Co. v. Grounds, 292 F.Supp. 619, 636 (D.Kan.1960). See also C. Wright, supra at 313; Kaplan, supra, 81 Harv.L.Rev. at 391-92. But cf. Eisen II, 391 F.2d at 368-369. The Advisory Committee is a respectable body of procedural experts who did not consider individualized notice to all or a certain percentage of class members a prerequisite to the maintenance of a Rule 23 class action as a constitutional (or extraconstitutional) requirement. Advisory Committee Notes, 28 U.S.C.A., Rule 23 Supplementary Note at 302. The commentators generally agree. Assuming vigorous representation of the class's interests by the representative plaintiff (which is not in issue here), notice by publication to unidentifiable class members is constitutionally sufficient. Mullane v. Central Hanover Bank and Trust Co., supra, 339 U.S. at 314, 70 S.Ct. 652. A scheme of notice by publication (with costs perhaps taxed to the defendants) in financial journals of wide circulation -the Wall Street Journal, Business Week, Barron's, the New York Times financial section, and the like-would reach most of the class.
 
 
 84
 To say, as the panel opinion says, Op. at 1017, that "[w]here there are millions of dispersed and unidentifiable members of the class notices by publication . . . are a farce," and to say it without any supporting data or authority, strikes me as, in the words of the panel opinion, a "rhetorical device," Op. at 1013. In this day and age of communications, why are such notices a "farce"? It may be that most people will not heed them-the sums may be too small to bother with, for example-but does this make the notices farcical? Probate notices published in small-town newspapers around the country are treated as notice to the whole world of possible creditors and heirs that an estate is being closed, and they are pretty effective for this purpose. Notice by publication of actions such as this in key, spot places can be, I should think, highly effective. If notice in the "Drug Cases," State of West Virginia v. Charles Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y. 1970), aff'd, 440 F.2d 1079 (2d Cir.), cert. denied sub nom. Cotler Drugs, Inc. v. Charles Pfizer & Co., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), could work reasonably well, why can't it work with a somewhat more sophisticated group of consumers, odd lot buyers? Rule 23 was not looking toward perfect or total notification; it was-and I write of it in the past tense for this purpose-reaching out for a practical result that would permit numbers of little injured people to have their day, too, in court.
 
 
 85
 The panel opinion's suggestion, Op. at 1019, that it should "be possible for the Congress to create some public body to do justice in the matter of consumers' claims in such fashion as to afford compensation to the injured consumer" is in my view an abdication of judicial responsibility. It is as much as to say that the courts are insufficiently inventive to be capable of handling a matter-the distribution of unlawfully obtained money to a large number of people. I doubt this very much. I suspect that the courts can do the job.
 
 
 86
 All in all, it seems to me that the panel's decision not merely ossifies, but destroys, the development of what was becoming an important procedural device for the airing of grievances where large numbers of people were affected and one individual did not have the resources to pursue his own legal rights to conclusion. At the very least the panel opinion should not be allowed to stand without full and complete consideration by the full active bench of this circuit, aided as we would be by the consultation and vote of the two distinguished senior judges who sat on the panel in question.
 
 
 87
 The Case Should Be Heard En Banc.
 
 
 88
 One can argue, as many wiser minds than the writer's have argued, that a court of appeals should never use the en banc procedure. The Learned Hand court was apparently able never to sit en banc. See generally M. Schick, Learned Hand's Court 105-06, 116-22 (1970). But this was before the number of judges on the court was expanded to meet the court's burgeoning business. In other words, it was when the court and its business were small enough to enable a good deal more consultation before adjudication among the judges on the court than now does or can occur. Never to use the en banc procedure would tend to fragment a court of 14 or 15 judges into panels of three, enabling a given panel-which sometimes consists of judges not appointed to the particular circuit court-to determine cases for the whole court. If panel decisions absent an en banc procedure were to be binding on the other members of the court (as with an en banc procedure this court has always treated them in the past), there would be (A) an even greater burden on the Supreme Court than it now has to correct egregious error or to examine important cases and (B) an individual active circuit court judge's vote would count, at least in the Second Circuit, in only the 160-220 cases per year on which he sits and be of no significance whatever in the remaining 1,000 ± cases[5] coming before the court.
 
 
 89
 In the event this court's tradition were to be broken and an individual panel's determination were not be be binding on the rest of the court, the Supreme Court's burden would be equally great and this court would be even more fragmented. Its decisions would merit only the support that the persuasiveness of the individual opinion writer or the prestige of the particular panel could muster. There would be no "law of the circuit" as such. The district judges and others who look to the Court of Appeals for guidance in their decision-making would find none.
 
 
 90
 Thus it seems to me that the en banc procedure, or some viable substitute for it, is essential to ensure cohesion, a degree of uniformity and the promotion of appellate justice, in the Court of Appeals. The en banc power has received the imprimatur of an 8-1 Supreme Court, in a case that is still law, as "a necessary and useful power-indeed too [sic] useful that we should ever permit a court to ignore the possibilities of its use in cases where it might be appropriate." Western Pacific Railroad Corp. v. Western Pacific Railroad Co., 345 U.S. 247, 260, 73 S.Ct. 656, 662, 97 L.Ed. 986 (1953). There are those of us, I suspect, who think the exercise of that power is one alternative preferable to the controversial national court of appeals which is receiving considerable attention these days.
 
 
 91
 The only viable alternative to the en banc procedure, if there is to be any genuine "court" position on a given case, is the prepublication circulation of all opinions for comment which is done in some circuits. This would be somewhat helpful but has the disadvantages of being advisory only, unless the en banc procedure is invoked; it also creates some work under the pressure of time deadlines additional to that which the en banc procedure permits. Prior circulation in seemingly important cases which is done in this circuit fairly frequently, with I think good result, but was not done in this particular case, has some merit, too; at least it may alert the whole court to an important case or the opinion writer or panel to some serious questions. Here even this alternative has been unavailable.
 
 
 92
 There Is No Good Reason for Not Hearing This Case En Banc.
 
 
 93
 There is no real pressure of time (the lapse of time since Eisen II is five years; the Supreme Court is unlikely to examine the inevitable petition for a writ of certiorari until four or five months from now),[6] that would, as to some extent it did in the Pentagon Papers case,[7] make en banc rehearing or opinion writing unfeasible. There is no reason why the Supreme Court should not have before it some view, even if it is not a majority one, from this court, different from the panel's if, as I think is undoubtedly the case, an en banc vote would result in such.
 
 
 94
 It is said or suggested that this case is so important that it will surely result in a grant of certiorari. With all respect I do not know how we can be so prescient about the United States Supreme Court. It may decide that it wants to hear from other circuits, and have a more balanced view before it than what is now the Second's, before it grants the all powerful writ. The Court may decide that it prefers to postpone the issue until another day, for reasons of internal administration or external policy.
 
 
 95
 I believe in short that our duty is to hear this case en banc. Since the panel opinion sounds the "death knell," see Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied, 386 U. S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967), for consumer and environmental class actions, the omission to do so is to my mind grievous. Perhaps, however, it will serve as a vehicle for a higher authority to tell us whether the admonitions of Western Pacific Railroad Corp. v. Western Pacific Railroad Co., supra, relative to the en banc procedure still have any meaning. If they do not, the world may not come to an end, but we will be an interesting court to watch as our eight active and six senior and numerous visiting and district judges go from decision to decision, guided 2 per cent[8] of the time by a grant of certiorari. We will at least be somewhat unpredictable, and this may create enough litigation on the chance that an individual panel may reverse that our calendar will become as unmanageable as the panel opinion felt the instant class action was.
 
 
 
 [1]
 We retained jurisdiction because of the doubt engendered by the phraseology of the "death knell" opinion, Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967) (Eisen I). We thought this case might be construed as making appealable an interlocutory order dismissing a case as a class action because "no lawyer of competence is going to undertake this complex and costly case to recover $70 for Mr. Eisen," see Korn v. Franchard Corp., 443 F.2d 1301 (2d Cir. 1971); Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), but perhaps denying appealability to a similar order holding the case to be a proper class action under amended Rule 23. While the "death knell" doctrine has been criticized by the Third Circuit in Hackett v. General Host Corp., 455 F.2d 618 (3d Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972), we think the consequences of class action rulings are so serious that these interlocutory orders should be made appealable, provided we adopt the view expressed by Chief Judge Friendly in Korn v. Franchard Corp., supra, 443 F.2d at 1307, to the effect that this Court should formulate the rule of appealability in such fashion that it "will afford equality of treatment as between plaintiffs and defendants." The same considerations which led this Circuit to apply the rule of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) in Eisen I, also would seem to require a rule allowing a defendant to appeal from an interlocutory order permitting the representative plaintiff to continue the suit as a class action
 The "collateral order" doctrine of Cohen is based on the pragmatic view that a decision which finally determines an issue in the case which is crucial to the further conduct of the case, and is collateral to the merits of the action, is to receive immediate appellate review if delay in such review will cause "irreparable harm" to the complaining party. The seeds of Cohen were sowed by the Supreme Court as early as Forgay v. Conrad, 6 How. 201, 205, 12 L.Ed. 404 when it was said that appealability should be allowed if the effect of an interlocutory order is such that if the order is immediately carried into execution the defendant "may be ruined before he is permitted to avail himself of the right" to appeal. An order sustaining a class action allegation clearly involves issues "fundamental to the further conduct of the case;" (see Gillespie v. United States Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964); Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); the order is also separable from the merits of the case; and irreparable harm to a defendant in terms of time and money spent in defending a huge class action when an appellate court may years later decide such an action does not conform to the requirements of Rule 23, is evident. By this extension or interpretation of Eisen I the rule of finality would be given a "practical rather than a technical construction," see Cohen, supra, 337 U.S. at 546, 69 S.Ct. at 1226; Gillespie v. United States Steel Corp., supra, 379 U.S. at 152, 85 S.Ct. at 311; and we would avoid a possible denial of justice caused by delaying review by permitting an interlocutory appeal of rulings either sustaining or striking class action allegations. (See Swift & Company v. Compania Colombiana, 339 U. S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950); Dickinson v. Petroleum Corp., 338 U.S. 507, 70 S.Ct. 322, 94 L.Ed. 299 (1950)).
 
 
 [2]
 Judge Weinstein's speech on this subject was reported in Weinstein, "The Class Action Is Not Abusive," New York Law Journal, May 1, 1972, p. 1, and May 2, 1972, p. 1
 
 
 [3]
 According to the opinion below, the names and addresses of approximately 2,000,000 class members can be identified. In addition, another 100,000 or more had oddlot transactions in stocks listed on the Exchange through what is called the "Monthly Investment Plan." These individuals can be identified through computer tapes in a manner similar to that used for locating the 2,000,000. Furthermore, another 150,000 or so public individuals had odd-lot transactions in stocks listed on the Exchange through "payroll deduction plans" operated by Merrill Lynch, Pierce, Fenner & Smith, Inc. Their names and addresses can be identified through the records of Merrill Lynch
 
 
 [4]
 52 F.R.D. 253, 265 (S.D.N.Y.1971)
 
 
 [5]
 We did not in our opinion in Eisen II intend our statement that "in such a case as this" plaintiff should defray the cost of notice to be dictum, as has been suggested, see Berland v. Mack, 48 F.R.D. 121, 131 (S.D.N.Y.1969). This statement was part of our interpretation of amended Rule 23 as applied in this case, especially with respect to the actual individual notice required by subdivision 23 (c)(2) to be given to those members of the class who could be identified. This was part of our instructions to conduct a hearing on the remand and decide whether the requirements of amended Rule 23 had been or could be met
 Nor did we decide or intend to say that in all cases or under all circumstances plaintiffs in class actions are or must be required to defray the cost of giving the various notices specified in amended Rule 23. This is an action to recover money damages for alleged violations of Section 4 of the Clayton Act and Section 6 of the Securities and Exchange Act of 1934. It is not a derivative stockholder's action asserting a cause of action in favor of a defendant corporation, which regularly sends communications to all the stockholders and may be said to owe its stockholders certain fiduciary duties, nor a case where a public utility corporation which regularly sends monthly bills to its current customers has been held to have overcharged its customers and the class suit is brought to compel a refund. There may be other similar examples of class actions in which, depending on the circumstances of particular cases, courts might find justification for holding that a representative plaintiff was not obligated to defray the cost of giving the notices required by amended Rule 23. We do not attempt any enumeration. It must be recalled that the provisions for notice in amended Rule 23 were intended to comply with constitutional requirements. See Advisory Committee's Note, 39 F.R.D. 69, 107.
 
 
 [6]
 Judge Tyler in discussing the notice problems observed that the plaintiff had also offered to send individual notice to all member firms of the New York Stock Exchange and to all commercial banks with large trust departments. This together with the individual notice to the 2000 class members with ten or more transactions and the 5000 selected at random, and the notice by publication, would in Judge Tyler's view "increase the likelihood of reaching a significant portion of the class," and would be in conformity with the requirements of due process
 
 
 [7]
 Judge Tyler's opinions following the remand are reported at 50 F.R.D. 471, 52 F.R.D. 253, and 54 F.R.D. 565
 
 
 [8]
 Judge Wyatt's approval of the settlement was affirmed by this Court at 440 F.2d 1079 (1971)
 
 
 [9]
 According to the Report of the Special Study of Securities Markets, Vol. I, p. 182 (1963), an attorney representing the odd-lot firms presented a proposal for an increased differential. The Director of the Division of Trading and Exchange expressed some doubt as to the Securities and Exchange Commission's jurisdiction over the matter. The Report states that "(t)he Commission declined to decide the jurisdictional question but stated that it had no objection to the proposal. It is to be noted that neither the Exchange nor the Commission asserted jurisdiction, the former denying its jurisdiction and the latter expressing doubts, yet each informally acquiesced in the increase." See also p. 200 of the Report
 
 
 [10]
 At the preliminary hearing defendants' Exhibit C contained a letter from the SEC to the New York Stock Exchange dated June 16, 1966. In part the letter stated that the "Commission hereby makes written request pursuant to section 19(b) of the Securities Exchange Act that the Exchange effect on its own behalf changes in its rules and practices in respect of odd-lot purchases and sales, and the fixing of reasonable rates of commission and other changes in connection therewith, to fix odd-lot differentials * * *."
 
 
 [11]
 15 U.S.C., Section 78k(b)
 
 
 [12]
 15 U.S.C., Section 78s(b)
 
 
 [13]
 The procedural safeguards we speak of were wisely embodied in the Fifth Amendment's Due Process Clause. The importance of due process of law and procedural fairness has been emphasized by some of our leading jurists. Justice Brandeis observed that "in the development of our liberty insistence upon procedural regularity has been a large factor." (Burdeau v. McDowell, 256 U.S. 465, 477, 41 S.Ct. 572, 576, 65 L.Ed. 1048 (1921) (dissenting opinion)). Justice Frankfurter also remarked that "(f)airness of procedure is 'due process in the primary sense * * *.' It is ingrained in our national traditions." (Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 161, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (concurring opinion))
 
 
 [14]
 28 U.S.C., Section 2072
 
 
 [15]
 15 U.S.C., Section 15
 
 
 [16]
 The District Court in Hawaii v. Standard Oil Co., 301 F.Supp. 982 (D. Hawaii, 1969) dismissed the class action allegation on the ground that "under the circumstances * * *, the class action based upon the injury to every individual purchaser of gasoline in the State, * * in the context of the pleadings, would be unmanageable." Hawaii, however, decided not to appeal this ruling to the Ninth Circuit, and, of course, the ruling was not before the Supreme Court for review in Hawaii v. Standard Oil Co., 405 U.S. 251, 256, n. 6, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972)
 
 
 [17]
 The Drug Cases, supra, 314 F.Supp. 710 (S.D.N.Y.1970), aff'd 440 F.2d 1079 (2d Cir. 1971), contain nothing that gives support to Judge Tyler's ruling that individual notice to a limited number of members of a group of 2,250,000 whose names and addresses were identified was sufficient compliance with the notice requirements of amended Rule 23. An examination of the briefs in the Drug Cases makes it clear that reasonable effort would not have uncovered the names and addresses of the members of the consumer class of persons who bought the drugs on prescription at drug stores. Therefore, publication as to the consumer class was deemed sufficient. Moreover, as appellant in the Drug Cases attacked the sufficiency of the notice to the members of the wholesaler-retailer class, this Court rejected this argument, observing that individual notice was sent by mail to each and every member of this class whose name was available. 440 F.2d at 1091
 
 
 [18]
 Decisions which have rejected the use of a preliminary hearing on the merits to decide the propriety of litigation proceeding as a class action include: Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir.), cert. denied Glen Alden Corp. v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); Katz v. Carte Blanche Corp., 52 F.R.D. 510 (W.D.Pa.1971); Fogel v. Wolfgang, 47 F.R.D. 213 (S.D. N.Y.1969); Cannon v. Texas Gulf Sulphur Co., 47 F.R.D. 60 (S.D.N.Y.1969); Mersay v. First Republic Corp. of America, 43 F.R.D. 465 (S.D.N.Y.1968). Judge Mansfield took the opportunity in Berland v. Mack, 48 F.R.D. 121, 132 (S. D.N.Y.1969) to comment on the preliminary hearing on the merits: "The suggestion that such abuse of the corporate treasury can be avoided by a preliminary hearing to determine the merits of the claim is illusory. Quite aside from the additional burden that it heaps upon the Court, it would be a rare case where the Court could assure the class of ultimate success even after a preliminary hearing."
 
 
 [19]
 Cases supporting a preliminary hearing on the merits are Milberg v. Western Pacific Railroad Co., 51 F.R.D. 280 (S. D.N.Y.1970), appeal dismissed, 443 F.2d 1301 (2d Cir. 1971), and, of course, Dolgow v. Anderson, 43 F.R.D. 472 (E.D. N.Y.1968)
 
 
 [20]
 See, City of Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N.J.1971); United Egg Producers v. Bauer International Corp., 312 F.Supp. 319 (S.D. N.Y.1970); Hackett v. General Host Corp., Civil No. 70-364 (E.D.Pa.1970), appeal dismissed, 455 F.2d 618 (3d Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 461 (E.D.Pa.1968)
 
 
 [21]
 Notice by publication has been sanctioned as consistent with due process of law under certain circumstances, Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). But in Schroeder v. City of New York, 371 U.S. 208, 212-213, 83 S.Ct. 279, 282, 9 L.Ed.2d 255 (1962) the Court refined the Mullane rule: "The general rule that emerges from the Mullane case is that notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question."
 
 
 [22]
 These suggestions were made and discussed in Shapiro, "Consumer Participation in Antitrust Class Action Part II", New York Law Journal, May 31, 1972, p. 1
 
 
 [23]
 The recent draft for the Manual for Complex Litigation suggests that problems of administering the class action should not justify denial of an appropriate class action request "except when the attention and resources required to be devoted strictly to administrative matters will frustrate the securing of ultimate relief to which the class members may be entitled." (p. 36). Due to our rejection of the fluid class recovery concept, we are compelled to conclude that this litigation falls squarely within this exception contemplated in the Manual. The administrative problems posed by this action will frustrate any effort to provide the individual class members with compensation for the alleged injuries
 
 
 [24]
 In the Report and Recommendations of the Special Committee of the American College of Trial Lawyers on Rule 23 of the Federal Rules of Civil Procedure, issued March 15, 1972, this quotation appears on p. 6 with supporting citations
 
 
 [25]
 Id., at 16. See also, Morris v. Burchard, 51 F.R.D. 530, 536 (S.D.N.Y.1971)
 
 
 [26]
 See, Dolgow v. Anderson, 43 F.R.D. 472, 487 (E.D.N.Y.1968); Miller, Problem in Administering Relief In Class Actions Under Federal Rule 23(b)(3), 54 F.R.D. 501, 508; Pomerantz, New Developments in Class Actions-Has Their Death Knell Been Sounded?, 25 Bus. Lawyer 1259 (1970)
 
 
 [27]
 Handler, The Shift From Substantive to Procedural Innovations in Antitrust Suits -The 23rd Annual Antitrust Review, 71 Colum.L.Rev. 1, 9 (1971). See also, Professor Handler's 24th Annual Antitrust Review, 72 Colum.L.Rev. 1, 34-42, in which he criticizes the fluid recovery procedure as sought to be applied in "class" actions. There are some additional trenchant comments in his 25th Annual Antitrust Review, published in the December, 1972 issue of The Record of the Association of the Bar of the City of New York, pp. 660 ff
 
 
 [28]
 In his recent book Federal Jurisdiction: A General View, containing his 1972 Columbia University James S. Carpentier Lectures, Chief Judge Friendly makes this comment on class actions pursuant to amended Rule 23, at page 120, omitting footnotes:
 Something seems to have gone radically wrong with a well-intentioned effort. Of course, an injured plaintiff should be compensated, but the federal judicial system is not adapted to affording compensation to classes of hundreds of people with $10 or even $50 claims. The important thing is to stop the evil conduct. For this an injunction is the appropriate remedy, and an attorney who obtains one should be properly compensated by the defendant, although not in the astronomical terms fixed when there is a multimillion dollar settlement. If it be said that this still leaves the defendant with the fruits of past wrong-doing, consideration might be given to civil fines, payable to the government, sufficiently substantial to discourage engaging in such conduct but not so colossal as to produce recoveries that would ruin innocent stockholders or, what is more likely, produce blackmail settlements. This is a matter that needs urgent attention.
 
 
 [1]
 Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in regular active service. A court in banc shall consist of all circuit judges in regular active service. A circuit judge of the circuit who has retired from regular active service shall also be competent to sit as a judge of the court in banc in the rehearing of a case or controversy if he sat in the court or division at the original hearing thereof
 28 U.S.C. Sec. 46(c).
 
 
 [2]
 Occasionally a vote to rehear a panel opinion en banc has been effective in the administration of individual justice. See United States ex rel. Whitmore v. Malcolm, 476 F.2d 363 (2d Cir., 1973), slip op. at 1615 (2-1 decision), where following this court's vote to rehear en banc a panel opinion affirming a denial of habeas corpus and with the rehearing en banc pending before us, the State prosecutor dismissed the case against the appellant, thereby mooting the appeal
 
 
 [3]
 I speak of a panel decision as one by three judges sitting on a Court of Appeals
 
 
 [4]
 I say "little people" because bigger investors don't generally deal in odd lots. They prefer to avoid the price differential in brokerage fees by dealing in lots of 100 or more. It is interesting to contrast this case with Lanza v. Drexel, 479 F.2d 1277 (2d Cir., 1973), (en banc), where this court did en banc and reverse a panel ruling that had a bearing, although in quite a limited factual situation in my opinion, on the liability for Securities Act violations of directors unconnected with management but highly involved financially. The panel opinion's decision here was partially reached in the name of fairness to defendants who thereby may retain, if the plaintiff's allegations are proven, profits obtained by violation of the antitrust laws. As I compute the cost of mailing readily identifiable members of the class from Judge Tyler's opinion, it was just over ten cents apiece or $218,750. 52 F.R.D. at 263
 
 
 [5]
 For fiscal year 1972, an unusually light year in this circuit, there were a total of 1,317 filings and 177 appeals terminated without decision. 1973's figures indicate that about 1,200 cases will come before the court
 
 
 [6]
 We are told that the average en banc proceeding takes about 155 days. This is not really necessary in my view but in this case would not be too harmful
 
 
 [7]
 United States v. New York Times Co., 444 F.2d 544 (2d Cir. 1971), rev'd, 403 U.S. 713, 91 S.Ct. 2270, 29 L.Ed.2d 853 (1971)
 
 
 [8]
 From information furnished by the Circuit Executive of our court, in fiscal year 1972 there were 369 petitions for certiorari from the Second Circuit filed and only 18 granted. In fiscal year 1973, 284 petitions have been filed and only 12 granted. If in forma pauperis petitions are included as cases heard by our court, the percentage of certiorari grants is closer to 1