**APPLETON ELECTRIC COMPANY,**
Plaintiff-Appellee,

v.

**ADVANCE–UNITED EXPRESS-
WAYS et al., Defendants-
Appellants.**

No. 73–1665.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1973.

Decided Jan. 16, 1974.

Peter V. Fazio, Sr., Michael W. Ford. James B. O'Shaughnessy, Chicago, Ill., Arthur Hauver, Denver, Colo., for defendants-appellants.

Jay A. Canel, Lawrence E. Morrissey, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, SPRECHER, Circuit Judge and POOS, Senior District Judge.*

SPRECHER, Circuit Judge.

This appeal considers the manageability of a class action with a multi-million member plaintiff class and a thousand-plus defendant class. The district court defined a class of plaintiffs (perhaps several million shippers) and a class of defendants (perhaps 1,400 motor carriers) who shipped goods in interstate commerce between May 20, 1968 through August 29, 1969 within a region covered

---

* Senior District Judge Omer Poos of the Southern District of Illinois is sitting by designation.

by tariff rates involved in Interstate Commerce Commission Docket No. 34971 (Increased Rates and Charges from, to and between Middlewest Territory).

## I

The complexity of the background of this case requires a somewhat complete analysis of its chronological development.

The Middlewest Motor Freight Bureau, Inc., filed and published proposed rate increases on behalf of its motor carrier members to take effect on April 1, 1968. The Interstate Commerce Commission permitted the rates to go into effect as scheduled but, because of protests by various parties, instituted an investigation of the lawfulness of the increased rates without suspending them. By order of April 3, 1968, the Commission ordered specific information and data to be filed, prescribed special procedures and set the matter for hearing on May 20.

On April 12, 1968, two of the protesting parties, the United States Department of Transportation and the General Services Administration, requested that the hearing date be postponed for 90 days. By letter of April 22, 1968, the carriers and their representatives also requested a 90-day postponement because of "the physical impossibility for respondents to compile the required data within the time allowed by the order." In response, the Commission issued an order on April 25 which provided in part:

"It is further ordered, . . . that the hearing be, and, it is hereby postponed to August 19, 1968, conditioned upon respondents' compliance with the refund provision ordered below. . . .

"And it is further ordered, that respondents be and, they are hereby, ordered to make refunds to the shippers on any shipment moving after May 20, 1968, to the extent that the increases or any portion thereof under investigation herein are not approved by the Commission."

On May 1, 1968, the carriers petitioned the Commission for reconsideration of the April 25 order but withdrew the petition when they learned that in similar situations the Commission had vacated orders granting postponements where the carriers refused to comply with refund conditions. The hearing took place on the postponed date of August 19, 1968. On June 5, 1969, the Commission issued its Report and Order, which found that "the proposed increases have not been shown to be just and reasonable." The Commission ordered the increased rates cancelled, and further ordered:

"That in accordance with the order entered herein on April 25, 1968, the respondents be, and they are hereby, required to refund to shippers the charges on shipments moving after May 20, 1968, to the extent that such charges included the increases herein found not shown to be just and reasonable." [1]

The carriers petitioned the Commission to vacate that portion of the June 5, 1969 order requiring refund payments to shippers. The Commission denied the petition on August 29, 1969 and ordered:

" . . . [T]hat the respondents will hereinafter, in accordance with the said decision of June 5, 1969, make refund to shippers presenting their claims to the carriers supported by paid freight bills or other appropriate evidence." [2]

Cancellation was made of the disputed increases on statutory notice, effective August 31, 1969, and simultaneously the involved carriers filed new and higher increases to become effective on September 1, 1969.

1. Increased Rates and Charges, From, To and Between Middlewest Territory, No. 34971, 335 I.C.C. 142, 151 (June 5, 1969).

2. Increased Rates and Charges, From, To and Between Middlewest Territory, I.C.C. No. 34971 (order of August 29, 1969).

On October 9, 1969, the carriers filed another petition for reconsideration of the June 5, 1969 decision, which the Commission denied. Two traffic conferences on the same date sought reconsideration of the August 29, 1969 order on the ground that it altered the method of refund payment set forth in the June 5 order. The Commission also denied the conferences' petition on October 27, 1969, "because the order of August 29, 1969, did not change the liability for making refunds, previously determined, but appropriately placed the burden for supporting claims for refunds upon the shippers who paid the charges." [3]

The carriers sought judicial review of the Commission's order of June 5, 1969, as modified by its order of August 29, 1969, by filing a complaint on January 26, 1970 in the United States District Court for the District of Colorado, seeking a declaration that the orders were invalid and an injunction against enforcement of the refund obligation by a three-judge court in accordance with 28 U.S.C. § 2325.[4] On June 19, 1970, the district court granted a motion for a temporary restraining order.[5]

On January 14, 1971, the three-judge court sitting at Denver, Colorado, in a memorandum opinion and order, dismissed the complaint of the carriers and thereby upheld the Commission order of June 5 as modified on August 29, 1969. The court held that the refunds required by these orders were neither a reparation authorized by 49 U.S.C. § 304a nor restitution under common law or equity principles, but rather *quid pro quo* refunds lawfully ordered by the Commission in return for the granting of the extension of time. The carriers were held to be estopped from contesting the orders and found to have waived the right to challenge their validity when they withdrew their objections thereto.

Admiral-Merchants Motor Freight, Inc. v. United States, 321 F.Supp. 353 (D. Colo.1971).

The three-judge court entered judgment against the carriers on February 4, 1971, which had the effect of vacating the stay of the orders which had been entered on June 19, 1970. On March 24, 1971, the court entered a new stay of the refund orders "pending the completion of appellate proceedings in the Supreme Court of the United States or in the Court of Appeals for the Tenth Circuit, or both."

The Supreme Court of the United States affirmed the three-judge court judgment on appeal without an opinion at 404 U.S. 802, 92 S.Ct. 51, 30 L.Ed.2d 37 (1971) and denied rehearing at 404 U.S. 987, 92 S.Ct. 443, 30 L.Ed.2d 371 (1971). On December 27, 1971, the Court of Appeals for the Tenth Circuit entered an order granting the carriers' motion to dismiss their separate appeal from the three-judge court judgment.

According to the carriers' brief on appeal in the present case,

> "Many shippers sued to collect refunds. There are currently pending 50 'sets' of cases in 20 state and federal jurisdictions throughout the country arising out of the June 5, 1969, and subsequent Commission orders. Each 'set' consists of from one to 20 separate complaints. Each complaint involves the claims of from one to approximately 200 plaintiffs against from one to several dozen defendants. Most of these cases have been pending for three years or longer; they are in various stages of trial and appeal."

Several of these cases and sets of cases have been filed in the district courts of this circuit, particularly in Chicago, and have been adjudicated by the dis-

---

3. Increased Rates and Charges, From, To and Between Middlewest Territory, I.C.C. No. 34971 (order of October 27, 1969).

4. 28 U.S.C. § 2325 provides: "An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission shall not be granted unless the application therefor is heard and determined by a district court of three judges . . . ."

5. 28 U.S.C. § 2324.

trict courts and, in two instances, by this court.

The district court granted summary judgment for the shipper in three cases consolidated in Aluminum Co. of America v. Admiral Merchants Motor Freight, Inc., 337 F.Supp. 674 (N.D.Ill.1971). The carriers unsuccessfully argued (1) the invalidity of the Commission's refund order; (2) the absence of the shippers as parties to that order; and (3) the absence of a statutory basis of recovery.

The district court granted summary judgment for the shippers in eight cases consolidated in Aluminum Co. of America v. Burlington Truck Lines, Inc., 342 F.Supp. 166 (N.D.Ill.1972). The carriers unsuccessfully argued (1) their right to defend on the equities as in a restitution suit; (2) failure of the shipper to state a claim for relief for reparations; (3) inapplicability of a res judicata effect of the three-judge Denver court since the carriers were not parties to the Denver proceedings although subject to the refund orders; and (4) their right to defend on the ground that the proposed rates were just and reasonable inasmuch as the Commission's order merely held that they failed to meet their burden of proving that the rates were just and reasonable.

The eleven *Aluminum Co.* cases were consolidated in this court in Aluminum Co. of America v. Admiral Merchants Motor Freight, Inc., 486 F.2d 717 (7th Cir. 1973), cert. denied, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973). We affirmed the summary judgments for the shippers and held that the Commission's refund orders were enforceable as orders to pay money under Section 16(2) of Part I of the Interstate Commerce Act,[6] which deals with railroads, because of Section 205(g) of Part II, which deals with motor carriers and provides in part (49 U.S.C. § 305(g) ):

> "Any final order made under this chapter shall be subject to the same right of relief in court by any party in interest as is now provided in respect to orders of the Commission under chapter 1 . . . ."

In holding that the refund orders were enforceable as orders for the payment of money under Section 16(2), we held that these were not proceedings for recovery of reparations under 49 U.S.C. § 304a nor common law restitution suits but were "only justified on the basis of the Commission's procedural powers, coupled with the equitable estoppel and waiver conditions which were found to exist by the three-judge panel" in the Denver case.[7]

We further held that the defense of invalidity of the refund orders was no longer available to the carriers; that the Denver judgment was effective under the doctrine of stare decisis, if not under res judicata, as to carriers not parties thereto; that the refund orders were enforceable although they fixed no time limit for compliance; and that a large number of other contentions had no merit.

A motion by the carriers to dismiss the shippers' complaint was denied in Bela Seating Co. v. Advance Transportation Co., 344 F.Supp. 854 (N.D.Ill.1972). The carriers unsuccessfully argued that the district court lacked jurisdiction, that the complaint did not state a claim for relief, and that the one-year statute

---

6. Section 16(2) of Part I of the Act, 49 U.S.C. § 16(2), provides in part as follows:
"If a carrier does not comply with an order for the payment of money within the time limit in such order . . . , any person for whose benefit such order was made, may file in the district court of the United States . . . , a complaint setting forth briefly the causes for which he claims damages, and the order of the commission in the premises. Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages . . . . "

7. Admiral-Merchants Motor Freight, Inc. v. United States, 321 F.Supp. 353, 359 (D. Colo.1971). See also, Aluminum Co. of America v. Burlington Truck Lines, Inc., 342 F.Supp. 166, 169–171 (N.D.Ill.1972); Bela Seating Co. v. Advance Transportation Co., 344 F.Supp. 854, 856 (N.D.Ill.1972).

of limitations of the Interstate Commerce Act had run. In regard to the limitation argument, the district judge held that the stay of the Commission's orders by the Denver court tolled the statute until the stay was terminated on December 27, 1971.

In Container Corp. of America v. Admiral Merchants Motor Freight, Inc., 489 F.2d 825 (1973), we reversed a district court order dismissing a shippers' complaint as barred by the one-year statute of limitations in Section 16(3)(f) of the Interstate Commerce Act.[8] Judge Stevens said:

> "In our opinion the 'date of the order' within the meaning of § 16(3)(f) is the date on which the litigation prosecuted by the carriers to obtain judicial review of the Commission's order was completed."

In other words, we held that the statute of limitations was not simply tolled but that it did not begin to run until "the judicial review sought by the carriers was concluded and the stay which had been entered by the district court in Colorado was lifted" on December 27, 1971.

Many other cases are pending in this circuit and around the country.[9] However, we are advised by carriers' counsel that the present case is the only class action pending.

This complaint was filed on June 15, 1970 by Appleton Electric Company and on behalf of all other persons similarly situated who shipped goods from May 20, 1968 through August 29, 1969 covered by the rates involved in Interstate Commerce Commission Docket No. 34971. Originally the complaint was directed against seventeen named motor carrier defendants, but the named plaintiff moved to amend the complaint on its face in order to add to the list of defendants the words "individually and on behalf of all others similarly situated." At the same time, plaintiff moved for a determination that the action be maintained as a class action.

On February 25, 1972, the district judge found that the action was properly maintainable as a class action and defined a plaintiff class and a defendant class as follows:

> "The class of plaintiffs shall consist of the Appleton Electric Company and all other persons similarly situated who (from May 20, 1968 through August 29, 1969) have shipped goods through interstate commerce via the facilities of the defendants within the region covered in Interstate Commerce Commission Docket No. 34971 (Increased Rates and Charges from, to and between Middlewest Territory), and subject to the rates referred to therein.

> "The class of defendants shall consist of the named defendants in the instant case and all other persons similarly situated who have transported goods through interstate commerce on behalf of a member or members of the plaintiff class from May 20, 1968 through August 29, 1969 within the region covered in Interstate Commerce Commission Docket No. 34971 (Increased Rates and Charges from, to and between Middlewest Territory), and who, in return for such transportation, received compensation from a member or members of the plaintiff class at the rates referred to in Docket No. 34971."

8. Section 16(3)(f) of the Interstate Commerce Act, 49 U.S.C. § 16(3)(f) provides: "A complaint for the enforcement of an order of the commission for the payment of money shall be filed in the district court or the State court within one year from the date of the order, and not after."

9. In Bemis Co., Inc. v. Burlington Truck Lines, Inc., No. 70–C–1580 in the Northern District of Illinois, Eastern Division, five shippers were granted a summary judgment against eighteen motor carriers. The carriers appealed to this court under No. 73–1695 but in accordance with a stipulation by the parties, the appeal was dismissed following our decision in Aluminum Co. of America v. Admiral-Merchants Motor Freight, Inc., 486 F.2d 717 (7th Cir. 1973).

Although the complaint originally relied for jurisdiction on 49 U.S.C. § 304a (reparation proceedings), the plaintiffs on June 20, 1972 moved for summary judgment on the basis of 49 U.S.C. §§ 16(2) and 305(g) (enforcement of Commission order for payment of money). On November 21, 1972, the court issued its memorandum, and on December 7, 1972 its order, granting summary judgment for the plaintiffs on the issue of liability and continuing the case on the issue of damages only.

On December 20, 1972, the court appointed independent counsel to represent the defendant class other than the seventeen named defendants. On January 18, 1973 the court appointed the two attorneys previously representing the named plaintiff and another attorney to represent the plaintiff class.

On April 17 and 18, 1973, the court held an evidentiary hearing to determine reasonable methods of ascertaining and notifying class members. On June 18, 1973, the court ordered that notice be sent to members of the plaintiff class by first-class mail and to members of the defendant class by certified mail, and that the members of plaintiff class be determined as follows:

"A. Each defendant that has in its possession or control records containing names of persons who shipped via their facilities, subject to Middlewest Freight Traffic Association tariffs described in I.C.C. docket 34971 (applicable tariffs) between May 20, 1968, and August 29, 1969 (applicable period), shall file with the Clerk of this Court within 60 days the names and most complete last-known addresses of all such shippers. Any such defendant may, at its option, supply the Court with the names and most complete last-known addresses of all persons who shipped via their facilities during the period specified herein, without segregating shipments made subject to the applicable tariff.

"B. Each defendant that has in its possession or control records of the names of persons who shipped via their facilities subject to the applicable tariff during a portion of the applicable period, shall file with the Clerk of the Court within 60 days the names and most complete last-known addresses of all such persons and, in addition, shall file with the Clerk of the Court within the said 60 days a supplemental list, identified as such, of all persons who shipped via their facilities subject to any Middlewest Freight Traffic Association tariff for an additional period of time so that the Court is supplied with a list of all persons who shipped via defendant's facilities for a period of 18 months closest in point of time to the applicable period. Any such defendant may, at its option, supply the Court with the names of all persons who shipped via their facilities during the period specified herein without segregating shipments made subject to the applicable tariff or other Middlewest Freight Traffic Association tariffs.

"C. Each defendant that has no records of persons who shipped via their facilities subject to the applicable tariff and during the applicable period shall file with the Clerk of the Court within 60 days the names and most complete last-known common addresses of all persons who shipped goods via their facilities subject to Middlewest Freight Traffic Association tariffs for the 18-month period of time closest in point of time to the applicable period. Any such defendant may, at its option, supply the Court with the names of all persons who shipped via their facilities during the period specified herein, without segregating shipments made subject to Middlewest Freight Traffic Association tariffs.

"D. The lists required to be filed pursuant to paragraphs 3A through 3C above shall be verified, and the verification shall state what paragraph of this Order the defendant has complied with. As to defendants who file pursuant to paragraph 3B, the verification shall state that said de-

fendant does not have the information required for compliance with paragraph 3A. As to defendants who file pursuant to paragraph 3C, the verification shall state that said defendant has none of the information required for compliance with paragraphs 3A or 3B."

The court specified that the June 18 order involved controlling questions of law as to which there are substantial grounds for differences of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation. On July 9, 1973, we allowed the defendants' petition for leave to appeal pursuant to 28 U.S.C. § 1292(b).

The district court also specified in its June 18 order that an appeal would not be grounds for a stay of any proceedings in this cause unless so ordered by the district or this court. On August 2, 1973, we ordered that the requirement that defendants produce the names and addresses of shippers within 60 days of June 18 be suspended until further order of this court. We were advised by counsel at oral argument that notice has been given to some 1400 members of the defendant class of the existence of this litigation and of its maintenance as a class action. The notice gives them the option to request exclusion from the defendant class. The cost of this notice has been preliminarily charged to the named plaintiff.

The named defendants contended in this appeal that (1) the action should not be maintained as a plaintiff class action because of its unmanageability and that (2) the defendant carriers should not be compelled to prepare lists of shippers because the Commission placed the *burden for supporting claims for refunds upon the shippers.* The counsel for unnamed defendants contended that (1) this was not an appropriate case for the maintenance of a plaintiff class action, (2) nor appropriate for maintenance of an action against defendants as

a class, and that (3) class action treatment of defendants "without minimal contacts with the State of Illinois will deny them their rights to due process of law under the Fifth Amendment to the United States Constitution."

## II

"Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture." Hawaii v. Standard Oil Co., 405 U.S. 251, 266, 92 S.Ct. 885, 893, 31 L.Ed.2d 184 (1972).

The unparalleled, obstructive and duplicative efforts by the carriers to avoid paying refunds that by their nature should have been more or less automatically returned to the shippers within a short time after the Colorado three-judge decision in January, 1971, underscores the basic wisdom of Rule 23 and our early assessment of it in Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7th Cir. 1941):

"To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit practice was to prevent.

. . .

"If the defense is to create barriers, and to make litigation expensive, so as to *avoid* trial, the opposition by defendants to a single trial can better be understood and appreciated. Such a position does not appeal to a chancellor, who wants to know the truth, and to fix liabilities on the basis of the true facts."

At the outset it is appropriate to identify several elements of this case which distinguish and set it aside from most other class actions.[10]

10. Inasmuch as this case and others filed to enforce Commission orders for the payment

of money have their jurisdictional genesis in 28 U.S.C. § 1336(a) or § 1337, neither of

In the first place, this situation is unique in that a general rate refund to a large host of shippers was the conditional remedy embodied in an Interstate Commerce Commission order. As we have seen, this is not a common-law or equitable restitution case nor a reparations case, but a proceeding to enforce the payment of money refunds due under a Commission order. Probably the closest analogy is the Illinois telephone refund case of the nineteen-twenties and thirties.

The Illinois Commerce Commission had ordered reduced rates in 1923 to apply to most of the intrastate service of the Illinois Bell Telephone Company. The company obtained an interlocutory injunction from a three-judge court, on the condition that in the event the interlocutory injunction were dissolved, the plaintiff would refund to its subscribers any sums paid by them in excess of the sums chargeable to them, pursuant to the provisions of the order of the Illinois Commerce Commission.[11]

The reduced telephone rates were bitterly contested, as were the motor rates here. When they reached the Supreme Court for the fifth time, Chief Justice Hughes, speaking for the Court, directed the dissolution of the interlocutory injunction. In Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 175–176, 54 S.Ct. 658, 668, 78 L.Ed.2d 1182 (1934), he said:

"The case has long been pending and should be brought to an end. The company has had abundant opportunity to establish its contentions. . . . It is enough that the rates have been established by competent authority and that their invalidity has not been satisfactorily proved.

"The decree below is reversed, and the cause remanded, with direction to dissolve the interlocutory injunction, to provide for the refunding, in accordance with the terms of that injunction . . . of the amounts charged by the Company in excess of the rates in suit . . . ."[12]

When the Supreme Court mandate came down, the three-judge district court supervised the refunding of $17 million to more than a million claimants with 85 percent of the claims being under $25.[13] The work of making refunds took over three years, was performed by as many as 2,000 telephone company employees under court supervision and cost the company in excess of $2,700,000. In affirming the refund decree, this court said in Illinois Bell Telephone Co. v. Slattery, 102 F.2d 58, 66 (7th Cir. 1939):

"While it seems to be conceded that plaintiff faithfully complied with the decree in the making of refunds, we do not see how it could hope to avoid the necessary expenses in making such refunds, nor in the payment of costs which follow the result of litigation. It must not be overlooked that it was responsible for the situation and that the burden incident thereto was necessary in order that it might extricate itself therefrom."

which requires a minimum jurisdictional amount, cases such as Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), and Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (42 U.S.L.W. 4087, Dec. 17, 1973), which relate to the jurisdictional amount in diversity class actions under 28 U.S.C. § 1332, have no application.

11. In this case, the Interstate Commerce Commission's order of April 25, 1968, was "conditioned upon respondent's compliance with the refund provision . . . that respondents . . . are . . . ordered to make refunds to the shippers . . . to the extent that the increases . . . are not approved . . . ."

12. That the invalidity of the reduced telephone rates had not "been satisfactorily proved" was tantamount to the Commission's finding here that "the proposed increases have not been shown to be just and reasonable" (order of June 5, 1969, 335 I.C. C. 142, 151).

13. Kalven and Rosenfield, The Contemporary Function of the Class Suit, 8 U.Chi.L.Rev. 684, 686 n. 5 (1941).

Here the carriers are responsible for the situation and must extricate themselves therefrom.

The fundamental nature of a refund case is what most strikingly distinguishes this case from Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973),[14] cert. granted, 414 U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146 (1973) (commonly known as *Eisen III*).[15]

*Eisen* is an antitrust case challenging the legality of "odd-lot differentials" charged by odd-lot dealers for transactions involving less than 100-share lots of securities. There has been no full hearing or decision on the merits. If the differentials were eventually held illegal, liability would consist of treble damages based on the illegal portion of the fees paid by some six million buyers and sellers of odd lots over a four-year period.

*Eisen III* made clear that many of the difficulties encountered there in managing a class action would not be present in a class action suit brought to compel a refund.[16] An alternative to a class suit suggested in *Eisen III*, that is, a suit for prospective injunctive relief, would not be available in a refund situation. 479 F.2d at 1020. These differences in the nature of the two cases, together with the fact that here the district court has already held the carriers liable for the refunds,[17] obviate the pos-

sibility that this class action would result in the "legalized blackmail" feared by the *Eisen III* court. 479 F.2d at 1019.

█ The difficulties defendants complain of are of their own making. They knew at the beginning of the rate-increase period that they might have to refund the increase. Yet they apparently set aside no funds, took no steps to keep adequate records for easy identification of their refund customers, and did no earmarking of the necessary documents. Some have even destroyed their records. Defendants who had early notice of their possible liability cannot avoid a class suit merely because their own actions have made the class more difficult to identify.

A second vital distinguishing element in this case is the lively interest shown by class members in the subject matter. The majority in *Eisen III* was significantly impressed by the lack of interest shown there (479 F.2d at 1010):

". . . [I]t was highly improbable that any great number of claims would, for a variety of reasons, ultimately be filed by the 6,000,000 members of the class. *No claimant in the 6 years of the progress of the action had shown any interest in Eisen's claim*. . . . The average individual class member [would recover] . . . approximately $1.30, and when trebled the average class mem-

---

14. Virtually the only similarity between the two cases is the very large number of members of the plaintiff class. In *Eisen*, there are six million members of the plaintiff class, of which 2,250,000 can be easily identified. Unless we read *Eisen III* to hold that numbers alone make a class unmanageable, we must analyze other factors which led to the *Eisen III* decision.

15. In *Eisen I*, the court employed the "death knell" theory for permitting the appeal of the dismissal of the class-action aspects of a case. Eisen v. Carlisle & Jacquelin, 370 F.2d 119 (2d Cir. 1966), cert. denied, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967). In *Eisen II*, the court remanded the case for an evidentiary hearing on questions of notice, adequate representation and effective administration of the action. Eisen

v. Carlisle & Jacquelin, 391 F.2d 555 (2nd Cir. 1968).

16. In discussing the *Eisen* problem of who must pay the expense of giving notice to the millions of members of the plaintiff class, the *Eisen III* court pointed out that *Eisen* was not "a case where a public utility corporation which regularly sends monthly bills to its current customers has been held to have overcharged its customers and the class suit is brought to compel a refund." 479 F.2d at 1009, n. 5.

17. The carriers have also had every conceivable defense to a claim for refund ruled upon adversely to them in Admiral-Merchants Motor Freight, Inc. v. United States, 321 F.Supp. 353 (D.Colo.1971), aff'd without opinion, 404 U.S. 802, 92 S.Ct. 51, 30 L.Ed.2d 37 (1971), and in the many other cases cited in Part I of this opinion.

ber would be entitled to damages of $3.90. As the costs of administration might run into the millions of dollars, it was not likely that a rush of claimants would eventuate no matter how extensive the publication." (Emphasis added.)[18]

Here hundreds of shippers have already filed suits in 50 "sets" of cases in 20 jurisdictions across the country. In this case, 259 shippers moved for leave to intervene as plaintiffs before any notice was served on the plaintiff class. Assuming that many claims may be small,[19] it is obvious that a very sizable number of claims are substantial enough to warrant the filing and prosecution of individual lawsuits and attempted intervention in this class action.

The third distinguishing element in this case involves the payment of what could amount to significant costs. In *Eisen III*, Eisen could not and would not pay the preliminary costs of giving notice to the plaintiff class. The court concluded (479 F.2d at 1015):

> "If identification of any number of members of the class can readily be made, individual notice to these members must be given and Eisen must pay the cost. If this cannot be done, the case must be dismissed as a class action."

We need not at this time decide for this circuit whether individual notice must be given to identifiable members of the plaintiff class inasmuch as our case has not yet reached the stage of completed identification.[20] The payment of costs, however, does not present the same problems here as in *Eisen*. First, "the plaintiff has never suggested that it would not pay the cost of notice if so ordered" (Pl. Brief, p. 15). Second, although the plaintiff has not volunteered that it will ultimately *bear* the costs, there is no requirement that a party agree to bear costs which a court could ultimately assess against his opponent. Third, section 16(2) of the Interstate Commerce Act which we held to apply to motor carriers in Aluminum Co. of America v. Admiral Merchants Motor Freight, Inc., 486 F.2d 717 (7th Cir. 1973), cert. denied, 414 U.S. 1113, 94 S. Ct. 843, 38 L.Ed.2d 739 (1973), provides in part:

> "Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the commission shall be prima facie evidence of the facts therein stated, and *except that the plaintiff shall not be liable for costs in the district court* nor for costs at any subsequent stage of the proceedings unless they accrue upon his appeal. If the plaintiff shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit." (Emphasis added.)

Fourth, if the costs are higher than they might have been if defendants had kept

---

18. Actually the lack of interest should not be a decisive factor in determining the propriety of a class action. In Hohmann v. Packard Instrument Co., 399 F.2d 711, 714 (7th Cir. 1968), Judge Swygert said: " . . . [W]hether other members of the class have sought to intervene is not determinative of the question whether the plaintiffs are qualified to act in behalf of the absent members of the class. Even one member of a large number of claimants can provide the kind of representation for all which might otherwise be unattainable if each claimant had to act individually."

19. Without any supporting data, an officer of one of the named defendant-carriers asserted in an affidavit that "practical experience in other cases indicates that the average cost of examining and verifying a claim on a freight bill is estimated to be at least 50 cents per shipment . . . " and that each claim "would not exceed 50 cents per bill."

20. Although the district court has already ordered that notice be given by first-class mail to those who will subsequently be identified, which would satisfy the requirements of *Eisen III*, we are allowing for the possibility that the eventual numbers of persons and cost of notice may cause adjustments to be made by the district judge in exercising his discretion in this regard. We do not desire to bind him in advance to a requirement that individual notice must be given to all identifiable members of the class.

better records, that is even more clearly defendants' burden to bear.

Finally, another factor in the dismissal of *Eisen III* was the creative, and as the court held improper, innovations the trial judge designed to avoid the practical difficulties. The "mini-hearing," the selective notice and the "fluid recovery" theory were three of these. The court of appeals found none of them warranted under Rule 23. In our case the district judge has employed only procedures that are clearly proper in federal class-action suits.[21]

In sum, the unmanageability of the class action in *Eisen III* has little relevance to the conduct of the case here. Inasmuch as this class action is based upon the April 25, 1968 and June 5 and August 29, 1969 orders of the Commission, ordering the carriers as a class to make refunds to the affected shippers as a class, we can draw a useful and compelling analogue from section 16(4) of the Interstate Commerce Act, which provides in part (49 U.S.C. § 16(4)):

"In such suits all parties in whose favor the commission may have made an award for damages by a single order may be joined as plaintiffs, and all of the carriers parties to such order awarding such damages may be joined as defendants . . . ."

■ Since Congress has given a particular imprimatur to the class action in such cases we should indulge every presumption to maintain this suit as a class action.

### III

Despite the many reasons for maintaining this action as a class action, both the named defendants and counsel for the unnamed defendants have argued that it is so financially overwhelming and incredibly complex that it is not manageable.[22]

The court held two days of evidentiary hearings to determine reasonable methods of ascertaining and notifying class members. The plaintiff produced the president of a freight audit bureau,

21. Again we do not, by distinguishing *Eisen III*, intend to indicate this circuit's approval of the Second Circuit's conclusion that these innovations are improper because we are not faced with that decision in this case. Note, Managing the Large Class Action: Eisen v. Carlisle & Jacquelin, 87 Harv.L.Rev. 426 (1973).

22. With a single exception, neither of the defendant representatives questioned the existence here of the prerequisites to a class action generally as set forth in Rule 23(a): "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of that class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The exception here is that counsel for unnamed defendants argued that the defenses of the representative parties are not typical of the defenses of the class. In view of the fact that almost every conceivable defense has been rejected by this court and others, and have become either res judicata or stare

decisis in this case, this argument is close to frivolous.

Both defendant representatives have agreed that this is a Rule 23(b)(3) type of class action and that the following additional guidelines for maintaining the action are applicable: "An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

The defendant representatives concentrated their attack on the alleged unmanageability of this class action.

who was qualified as an expert traffic auditor. He testified as to the methods of ascertaining the names and addresses of plaintiff-class shippers. The defendants produced 16 witnesses, all of whom were employees or representatives of named defendants. They testified as to the records each carrier still maintained for the period in question and the difficulties and costs involved in furnishing names and addresses of shippers. Some carriers still maintained complete records for the applicable period; some carriers had records for only a part of the period; and some carriers had no records at all for the applicable period.

At the conclusion of the evidentiary hearing the trial judge established three categories of carriers: (1) from those with complete records, he required the names and most complete last-known addresses of all shippers who shipped subject to the tariff described in Commission docket 34971 during the period between May 20, 1968 and August 29, 1969; (2) from those with partial records, he required the names and addresses of affected shippers during the portion of time for which records are available plus a supplemental list of all persons (with addresses) who shipped subject to any Middlewest Freight Traffic Association tariff for an additional period of time so that a period of 18 months closest to the applicable period is available to the court; and (3) from those with no records pertaining to the applicable tariff, he required the names and addresses of all persons who shipped subject to any Middlewest Freight Association tariff for the 18-month period of time closest to the applicable period. For *each* category, he provided the following option (with slight language variations for each category):

"Any such defendant may, at its option, supply the Court with the names and most complete last-known addresses of all persons who shipped via their facilities during the period specified herein, without segregating shipments made subject to the applicable tariff."

The court further required that each list of names and addresses·be filed with the clerk of the court within 60 days, that each list be verified and that the verification state with which category the carrier is complying.[23]

This circuit and its district courts have traditionally been tolerant of the manageability of multi-party litigation. In Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 285 F.Supp. 714, 724–725 (N.D.Ill.1968), the court said:

"Concerning Clause D [of Rule 23(b)(3)], the difficulties likely to be encountered in the management of a class action are not important when weighed against the benefits to ꞌthe class, and any subclasses thereof, and to the administration of justice."

And in Illinois v. Harper & Row Publishers, Inc., 301 F.Supp. 484, 491 (N.D. Ill.1969), the court said:

"Even though the class actions may expand administrative tasks, the benefits to be secured will more than outweigh the additional chores."

Also, in view of the broad discovery of class members permitted in this circuit (Brennan v. Midwestern United Life Ins. Co., 450 F.2d 999 (7th Cir. 1971), cert. denied, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972)), it would indeed be anomalous to place restrictions on discovery in this refund case.

■ ■ The district judge here heard the witnesses testify at length and in de-

23. The testimony at the hearing also tended to show the difficulties and costs which will be incurred once notice is given to the shippers. Defendants contend that rate experts would be needed to do a bill-by-bill analysis to determine which bills were subject to increases, the amounts of such increases, and what party paid and bore the burden of such increases. The plaintiff contends that re-

funds could be calculated simply by multiplying each affected freight charge by 4.726 percent for shipments under 5,000 pounds and 2.193 percent for shipments over 5,000 pounds. The defendants have at least implied that such a formula is feasible. (App. at 78–79; Def. Br. at 3). In any event, we are not yet faced with this problem.

tail about the alleged difficulties and costs, yet he concluded that, with the assistance of counsel, he could manage the class action. In reaching this conclusion, he was justified in considering, as we presume he did, that the carriers were given adequate notice that refunds might ultimately be necessary, that consequently they should have kept and earmarked all necessary documents and records, and that difficulties and costs resulting from their failure to do so would be at their own risk and burden.[24] Class actions cannot be defeated by destroying records. Nor should they be defeated because the prospective refunder has taken so much from so many that complexities arise.

At some point in the future, refunds will be made, as the Commission ordered, "to shippers presenting their claims to the carriers supported by paid freight bills or other appropriate evidence."[25] At this time, all we are concerned with is giving notice to the class of shippers who are entitled to refunds, so that they may have the opportunity to present their claims.

The time has come for the carriers to stop spending money to defeat these rightful refunds and to begin spending money to accomplish them. Manageability will be greatly assisted once the carriers' attitude is one of cooperation rather than opposition.

▇ Rule 23 obviously vests the trial judge with wide discretion in his application of the various guidelines, including manageability, set forth in section (b)(3). We hold that the district court did not abuse its discretion.[26]

## IV

Counsel appointed to represent the unnamed defendants has raised jurisdiction and venue objections to the inclusion in the defendant class of corporations which may have no "minimal contacts" with the Northern District of Illinois.

In proceedings under section 16(4) of the Interstate Commerce Act,[27] the following procedure applies (49 U.S.C. § 16(4)):

". . . [S]uch suit may be maintained by such joint plaintiffs and against such joint defendants in any district where any one of such joint plaintiffs could maintain such suit against any one of such joint defendants; and service of process against any one of such defendants as may not be found in the district where the suit is brought may be made in any district where such defendant carrier has its principal operating office."

A single defendant must be sued in a district where it is present. Farmers Union Supply Co. v. Colorado & Southern Ry. Co., 25 F.Supp. 923 (N.D.Tex. 1939); Graustein v. Rutland R. Co., 256 F. 409 (D.Mass.1919). Both cases seem to acknowledge that the court would have had jurisdiction over the defendant railroad if it had been sued as a joint defendant with a carrier doing business within the district. "Such actions [under section 16(4)] may be filed in the

---

24. There appears to be no justification for the unavailability of records. A maxim in the law of evidence is *omnia praesumuntur contra spoliatorem* (all things are presumed against a despoiler). The law will presume that the evidence destroyed would establish the plaintiff's claim. Middleton v. Middleton, 188 Ark. 1022, 68 S.W.2d 1003, 1005–1006 (Ark.1934); Pomeroy v. Benton, 77 Mo. 64, 86–87 (1882).

25. Order of August 29, 1969 in I.C.C. No. 34971.

26. Upon oral argument, reference was made to the need to alphabetize the lists required in order to avoid duplication of names. Although there was testimony before the district court that alphabetizing would be one way to avoid duplication (App. at 124), the court's order does not require it. We consider such details to be within the district court's discretion.

27. As pointed out *supra*, in Aluminum Co. of America v. Admiral Merchants Motor Freight, Inc., 486 F.2d 717 (7th Cir. 1973), cert. denied, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973), we held that section 16(2) of the Interstate Commerce Act (49 U.S.C. § 16(2)) authorizes the shippers' suit for refund of the overcharges.

district of the plaintiff, or in the district of either of the defendants, and service will then run against the other defendants to their place of abode." Farmers Union Supply Co. v. Colorado & Southern Ry. Co., 25 F.Supp. 923, 924 (N.D. Tex.1939).

■ Thus, in suits under section 16 against multiple defendants, Congress has authorized one district court to accept jurisdiction and venue over defendants with no contacts with the district.

■ Even if this were not a suit under section 16 of the Interstate Commerce Act, Rule 23 must be interpreted to allow inclusion of all class members, whatever their connection with the forum. As Judge Robson said in Research Corp. v. Pfister Associated Growers, Inc., 301 F.Supp. 497, 501 (N.D.Ill.1969), to require the establishment of venue for nonrepresentative-party class members "would eliminate the use of the class-action route in all cases where a defendant class is appropriate."

The notice and exclusion provisions of Rule 23(c)(2) [28] were designed to "fulfill requirements of due process to which the class action procedure is of course subject." 28 U.S.C., Rule 23, Advisory Committee's Note at 302. The clearest statement of those requirements is in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). To be bound by a final judgment in a representation suit, one must be "informed that the matter is pending and [have the opportunity] to choose for himself whether to appear or default, acquiesce or contest." 339 U.S. at 314, 70 S.Ct. at 657. The kind of notice mandated in *Mullane* is exactly the kind of notice defendant class members will receive in this case. An affidavit listing the names and addresses of all 1,400 of the members has been filed in the district court.[29] Each one will receive by certified mail a notice of the suit. The members' contacts with the forum are as irrelevant here as were beneficiaries' contacts with the State of New York in *Mullane*.

■ The only possible constitutional infirmity is inadequate representation. *See* Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Counsel for the unnamed defendants claims there is a conflict of interest between named and unnamed defendants.[30] But the only difference between named and unnamed defendants is the fact of being named in this suit; all defendant class members have potential conflicts among themselves in apportioning the refunds they pay to the shippers but this is true in most class actions. An unnamed member who feels it cannot be adequately represented by named defendants or by counsel for unnamed defendants will have the opportunity to "opt out" of the suit and not be bound by the judgment or to be represented by a lawyer of his own choice. The opportunity for exclusion is adequate protection for whatever due process rights are not satisfied by actual notice and representation by the named defendant or by counsel for unnamed defendants. *See* Research Corp. v. Asgrow Seed Co., 425 F.2d 1059 (7th Cir. 1970); Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 285 F.Supp. 714, 721 (N.D.Ill.1968).

The judgment order is affirmed.

Affirmed.

---

28. "In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel."

29. Pl. Brief at 21.

30. Where two or more carriers have participated in a particular shipment, one carrier collects the freight charge and apportions it to the others. Counsel suggests a collecting carrier will have to refund the entire overcharge to a shipper, and then will have to assert claims against the other participating carriers for their share of the overcharge.